MIDDLETON v. LA COMPAGNIE GÉNÉRALE TRANSATLANTIQUE.

(Circuit Court of Appeals, Second Circuit. February 28, 1900.)

NAVIGABLE WATERS—STATE JURISDICTION OVER—INLAND WATERS OF NEW JERSEY.

The act of the legislature of New Jersey of March 12, 1846, ceding to the United States jurisdiction over all that portion of Sandy Hook owned by the United States, lying north of a specified line, and "bounded on all other sides by the sea and Sandy Hook Bay," if effective, did not vest the United States with exclusive jurisdiction beyond the land it owned, above low-water mark, leaving the adjacent waters of the bay, which had previously been determined by the joint action of the United States and the states of New York and New Jersey to be inland waters of the state, still subject to its legislative jurisdiction; and an action may be maintained in a court of admiralty, based on the state statute, to recover for a wrongful death occurring in such waters.

Appeal from the District Court of the United States for the Southern District of New York.

This is an appeal from a decree of the district court, Southern district of New York, awarding $12,500 as damages sustained by the widow and next of kin of Robert H. Middleton, deceased. On May 14, 1898, the deceased, together with seven others, was engaged in testing cables connecting the mines in the main ship channel, harbor of New York, during the late war with Spain. Through the mine field in this main ship channel there had been reserved a passageway for friendly vessels, 300 feet in width, known as the "Mine Channel." Deceased and his co-workers were in a small boat—an old life boat—fastened to a buoy on the northerly side of such channel. While the steamer La Touraine was passing out to sea between 12 and 1 o'clock in the afternoon of the day named, the boat was upset, and Middleton was drowned. The libel avers that this was caused solely by the fault and negligence of those in charge of La Touraine.

Edward K. Jones, for appellant.
George W. Betts, Jr., for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. The location of the accident was a little southwest of red buoy No. 6, main channel; and the first point raised by appellant is that the statute of the state of New Jersey giving to the administrator a right of action for damages sustained by the widow and next of kin in the case of death negligently caused was of no authority at the place where such accident happened. It appears that such point was not presented to, nor argued before, the district court. Certainly there is no reference to it in the opinion of the district judge. Nevertheless it may fairly be raised upon the pleadings, and, when raised, may be briefly disposed of.

It was settled in the case of The Harrisburg, 119 U. S. 199, 7 Sup. Ct. 140, 30 L. Ed. 358, that there can be no recovery in a court of admiralty, under the general maritime law, for loss of life. Therefore, in order to maintain this suit, it must be shown that the accident happened at a place within the legislative jurisdiction of some state whose law permits such recovery. Although red buoy No. 6

is within three quarters of a mile of Sandy Hook, it is more than a marine league distant from the mainland of New Jersey, if the peninsula of Sandy Hook be eliminated from consideration; such peninsula being the property of the United States. Appellant's contention is based upon the old rule which limited jurisdiction over the waters of the ocean to a strip extending one marine league from shore, and considered inland waters a part of the main sea, when inclosed by headlands more than two marine leagues across. These arbitrary distances were fixed upon at a period when it was assumed that a marine league was the effective range of a heavy gun, and it may well be doubted whether they will not be extended by the courts to conform to changed conditions. Certainly it may be expected that every maritime nation will insist upon the control of its own coast waters to the extent to which it is able to dominate them from the shore. That question, however, need not be passed upon in this case. The boundary line between inland waters and the main sea has indeed been fixed by the secretary of the treasury, under a recent act of congress, much further out; but, even if such boundary were to be taken as the line connecting the point of Sandy Hook with the opposite headland at Coney Island, the distance between such headlands being less than two marine leagues, red buoy No. 6 will be found to be well inside of it. We have, then, a case which deals, not with the strip of ocean which extends seaward from a maritime frontier, but with waters wholly inland, where ownership and jurisdiction are distributed between the abutting territory according to the domestic laws of the country within which such waters lie. Such distribution in the case at bar may be ascertained, not by any discussion of ancient charters, or by any extended analysis of the principles governing riparian boundaries. It has been settled expressly and positively by the conjoint action of the only three political powers which could by any possibility be held entitled to exercise jurisdiction over such locality. The states of New York and New Jersey and the United States of America have legislated in harmony. Laws N. Y. 1834, p. 8; Pub. Laws N. J. 1834, p. 118; Act U. S. June 28, 1834 (4 Stat. 807). The last-cited act contains this paragraph:

"The boundary line between the two states of New York and New Jersey from a point in the middle of the Hudson river * * * as heretofore ascertained and marked, to the main sea, shall be the middle of the said river, of the Bay of New York, of the water between Staten Island and New Jersey, and of Raritan Bay, to the main sea, except as hereinafter otherwise particularly mentioned."

The exceptions do not affect the locality in question. In 1834, therefore, we may take it as definitely settled that the locality in question, which is far on the Jersey side of the middle line of Raritan Bay continued to the main sea, was within the limits of the state of New Jersey, and subject to the operation of the public laws of that state. In 1848 that state passed the statute giving damages to widow and next of kin, and it only remains to inquire whether anything had meanwhile occurred to withdraw the locality from the operation of such statute.

On March 12, 1846, the state of New Jersey passed an act entitled "An act to vest in the United States of America jurisdiction over Sandy Hook." The first two sections read as follows:

"Section 1. Be it enacted by the senate and general assembly of the state of New Jersey, that the jurisdiction in and over all that portion of Sandy Hook, in the county of Monmouth, owned by the United States. lying north of an east and west line through the mouth of Young's creek at low water, and ex-·tending across the island or cape of Sandy Hook from shore to shore, bounded on all other sides by the sea and Sandy Hook Bay, be and the same is hereby ceded to the said United States, for military purposes; and the said United States shall retain such jurisdiction so long as the said tract shall be applied to the military or public purposes of said United States. and no longer.

"Sec. 2. And be it enacted, that the jurisdiction ceded in the first section of this act, shall not prevent the execution on the said tract of land of any process, civil or criminal, under the authority of this state, except so far as such process may affect any of the real or personal property of the United States of America within the said tract; nor shall it prevent the operation of the public laws of this state within the bounds of said tract, so far as the same may not be incompatible with the free use and enjoyment of the said premises by the United States for the purposes above specified."

The constitution of the United States provides that:

"Congress shall have power to exercise exclusive legislation in all cases whatsoever over such district (not exceeding ten miles square) as may, by cession of particular states and the acceptance of congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, arsenals, dock-yards and other needful buildings." Article 1, § 8.

It has been held that whenever a state statute purporting to give consent to such purchase and to convey jurisdiction can be so construed as to leave the sole and exclusive jurisdiction in the United States, except so far as to admit of the service of state process, it must be so construed in harmony with the above-cited provision of the constitution, and that, if it cannot be so harmonized, "it may well be doubted if such consent be not utterly void," in which case the United States would seem not "to have purchased with the consent of the state." Railroad Co. v. Love, 114 U. S. 525, 5 Sup. Ct. 995, 29 L. Ed. 264. The same authority, moreover, holds that the provision of the constitution applies only to property purchased with the consent of the state, and that where lands are acquired in any other way, as by cession, the legislative power of the state over them will be as full and complete as over any other places, except that it shall not be so used as to destroy or impair the effective use of the forts, arsenals, or other public buildings which may be erected upon them. In view of this last proposition, it might be sufficient to dispose of this case to call attention to the circumstance that it nowhere appears in the record that the United States purchased Sandy Hook. Certainly this court does not know whether or not they did. so. But, assuming that they did purchase what the act defines, viz. "that portion" of Sandy Hook "* * * lying north * * * of Young's creek * * * and extending across the island or cape of Sandy Hook from shore to shore, bounded on all other sides by the sea and Sandy Hook Bay," they certainly did

not thereby obtain any land below low-water mark. The purchase, if there was a purchase, and the act of cession, if it be susceptible of a construction which will bring it into harmony with the constitution, and thus make it a valid "consent to the purchase," gave to the United States the right to exercise exclusive legislation only in so much of the state of New Jersey as was thereby transferred. Over all other places within the limits of that state her legislative power remains as full and complete as it was before, except that it must be so exercised as not to destroy or impair the forts, arsenals, and other structures erected on the land transferred to the federal government for military or public purposes. The accident happened, as we have seen, upon inland waters which were within the limits of the state (conceded to be so by the neighboring state and by the United States) before the act of cession; and, since that act does not purport to transfer the locality in question, the public laws of New Jersey are in full force there, and were so at the time of the accident.

Upon the other questions in the case we are inclined to concur in the findings of the district judge, who saw and heard the witnesses, viz. that the small boat was not within the mine channel; that La Touraine did come into actual contact with her after the latter had passed the engine room; that by that time the lashing of the taut cable had been severed, but that in rubbing along against the boat the steamer brought her propeller blade against one of the other cables, and thus jerked the boat over. There is no dispute that the boat was at anchor, nor that La Touraine saw her in ample time to avoid her, and was expressly warned by the government patrol boat to keep away from her to the southward; and we concur in the conclusion of the district judge that La Touraine either failed to enter the mine channel sufficiently far to the southward, or failed to head sufficiently to starboard to overcome the cross set of the tide, or, we may add, entered the channel too close after the Ems, in view of the necessity of entire freedom to maneuver so large a boat in so narrow a channel. One or other of these maneuvers brought La Touraine nearer to an anchored boat, properly located, than was necessary or prudent; and, since actual collision resulted, she must take the consequences.

In view of the testimony as to the age, health, and business history of the deceased, the amount of damages awarded was not excessive. The decree of the district court is affirmed, with costs.