### STERN v. LA COMPAGNIE GENERALE TRANSATLANTIQUE.

(District Court, S. D. New York. August 23, 1901.)

1. ADMIRALTY JURISDICTION—ENFORCING REMEDY GIVEN BY STATE STATUTE.

Although a court of admiralty has jurisdiction of an action to enforce a remedy for a tort, given by a state statute, where such tort was of a maritime nature, and committed on navigable waters, it can give no relief except in conformity with the statute creating the right of action.

2. WRONGFUL DEATH—ACTION UNDER NEW JERSEY STATUTE—LIMITATION.

The New Jersey statute of 1848 (1 Gen. St. p. 1188) gives a right of action for wrongful death, "provided, that every such action shall be commenced within 12 calendar months after the death of such deceased person." *Held*, that such proviso was not merely a designation of the ordinary period of limitation for such actions, operating, as a part of the general statute of limitations of the state, on the remedy alone, and hence subject to extension under a provision of such general statute when the defendant was not a resident of the state, and leaving an action to enforce the right given when brought in another jurisdiction, to be governed by the law of the forum as to limitation, but was an express condition of the right of action itself, which must be given effect in every forum wherein an action based upon the statute is instituted.

3. LIMITATION OF ACTIONS—TIME OF COMMENCEMENT TO RUN—ACTION IN FOREIGN JURISDICTION.

Even if such proviso be held subject to the provision of the general statute of the state that limitation should not run during the time a defendant was not a resident of the state, a plaintiff bringing an admiralty action to enforce the statutory liability in another jurisdiction more than a year after the death sued for cannot invoke such extension, where the action might have been brought in the same court at any time

previously, and service on the defendant obtained, and no excuse for the delay is shown.

**4. SAME—PLEADING STATUTE.**

In an action based on a statute, which makes the time of bringing the action an express condition of the right given, it is incumbent on the plaintiff to plead a performance of such condition, and the defendant is not required to plead the limitation in the statute to entitle him to insist on the objection that the action was not brought within the time limited.

In Admiralty. Action under state statute to recover for wrongful death.

Hunt, Hill & Betts, for libelant.

Edward K. Jones, for respondent.

BROWN, District Judge. The above libel was filed on March 22, 1900, to recover damages for the death of John V. Poussa, a seaman, from drowning within the waters of New Jersey near Sandy Hook, about noon of May 14, 1898, through the upsetting of a small lifeboat, in which the deceased was engaged with other workmen in repairing wire cables connecting with some submarine mines. The boat was upset, as alleged, by the too near approach of the respondent's steamer La Touraine, outward bound, in going through the channel way 300 feet in width, between the mines, in the strong flood tide.

The accident was the same as that in which another workman, Robert H. Middleton, was also drowned, and for which on a previous libel the respondent was held liable for want of proper care and skill in the management of the vessel. Middleton v. La Compagnie, 41 C. C. A. 98, 100 Fed. 866.[1]

1. On the present hearing all the testimony in the former case, as respects the question of negligence, has been introduced, and also the testimony of a number of additional witnesses on each side, who were not called in the former case. Among the new witnesses called for the libelant was Woodsum, a seaman of evident intelligence, who was in the bow of the small boat and who testified positively that on the order of Rees, who was in charge of the boat, he cut the cable that was lashed to the small boat, soon after La Touraine in passing caught the small boat and dragged it along with her; and that after cutting the cable the boat drew rapidly astern until it was upset under the steamer's counter. The other new witnesses present more or less contradictions as before. All the new witnesses for the respondent, save one, made affidavits in its behalf on a motion for a rehearing after affirmance in the circuit court of appeals in the former case, but the affirmance was nevertheless adhered to and a rehearing denied. On the whole testimony I cannot say that my judgment of the probable truth of the matter is changed from the conclusion arrived at in the former case.

In the disposition of this case, however, there are other considerations, which I think must prevent any decree in the libelant's favor.

2. The present libel was not filed until nearly two years after the decedent's death, whereas the New Jersey statute on which the

---

[1] See note at end of case.

action is founded requires such suits to be commenced within one year. The action is not one authorized by the common law or by the maritime law of this country. The Harrisburg, 119 U. S. 199, 7 Sup. Ct. 140, 30 L. Ed. 358. It rests solely upon the statutory enactments of the territorial jurisdiction wherein the negligence and the death occurred; in this case, upon the New Jersey statute of 1848. That statute, after creating such actions for "the exclusive benefit of the widow and next of kin," continues as follows:

"And in every such action the jury may give such damages as they shall deem fair and just with reference to the pecuniary injury resulting in such death to the wife and next of kin of such deceased person: provided that every such action shall be commenced within 12 calendar months after the death of such deceased person." 1 Gen. St. p. 1188.

Though this court has jurisdiction of the cause of action in consequence of its maritime nature as a tort committed upon navigable waters, it can give no relief except in conformity with the statute that creates the right. The Edith, 94 U. S. 518, 24 L. Ed. 167; The A. W. Thompson (D. C.) 39 Fed. 115, 117; City of Norwalk (D. C.) 55 Fed. 98, 102; Robinson v. Navigation Co., 20 C. C. A. 86, 73 Fed. 883, 894.

The libelant contends, however, that the one year proviso of the New Jersey statute is no part, or condition, of the right of action itself, but is to be construed as ordinary statutes of limitation are construed, viz. as affecting the remedy alone, and hence to be applied only according to the law of the forum where the suit is brought; and that as this suit is in New York, the period of limitation for such actions is the New York limitation of two years, instead of one year, as in New Jersey. See Dennick v. Railroad Co., 103 U. S. 11; Leonard v. Navigation Co., 84 N. Y. 48, 53, 38 Am. Rep. 491. It is further claimed that the modifying provisions of the general statute of limitations, both in New Jersey (1820) and in New York, as to the time when the period of limitation shall begin to run, and extending the continuance of the period during the time of defendant's absence or nonresidence from the forum where suit is brought, are also applicable; so that, as the defendant is a French corporation, having had no officer or place of business in New Jersey, the period of limitation there has never in fact begun to run; and that as respects New York also, under the New York statute, the period of limitation has for the same reason never attached.

The general statute of limitations of New Jersey (1820) declares that

"The time or times during which such person or persons shall not reside in this state, shall not be computed as part of the said limited period within which such action or actions are required to be brought." 2 Gen. St. p. 1976.

The actions referred to by this statute are stated to be those "specified in the first, second, third, fifth, sixth and seventh sections of this act." Only the actions stated in the second section have any analogy to the present libel, and those are the common-law actions of trespass for assault, menace, battery, wounding and imprisonment, which are limited to four years; but none of the actions there referred to are limited to one year. It is argued, however, that as the actions

named in the statute were the only actions of tort for negligence then existing, the same general statute of limitations should be deemed to extend to the subsequently created statutory action for death caused by negligence; because the extension of time during the nonresidence of the defendant is within the reason, the policy, and the equity of the general statute of limitations with all its modifying provisions.

The argument is, perhaps, a sound one, so far as compatible with the terms and apparent intent of the new statute. If, for instance, a new act, after creating some new right of action, should add: "The period of limitation for such actions shall be one year," or other equivalent words, there would be no doubt, I think, that such language would be construed as intended to form a part of the general statute of limitations, to be applied to such new actions; and that consequently all the other modifying provisions of the general statute of limitations would be deemed to attach to it.

But the language of this act is different and not compatible, I think, with the libelant's contention. If that contention were sustained the period of limitations would be according to the law of the forum where suit is brought. Bauserman v. Blunt, 147 U. S. 647, 654, 13 Sup. Ct. 466, 37 L. Ed. 316; Telegraph Co. v. Burnham, 162 U. S. 339, 16 Sup. Ct. 850, 40 L. Ed. 991; Nonce v. Railroad Co. (C. C.) 33 Fed. 429, 436; Leonard v. Navigation Co., 84 N. Y. 48, 38 Am. Rep. 491; Putnam v. Dike, 13 Gray, 535. Hence, there would be no limit at all to the time within which such an action could be brought under the New Jersey statute in any other state except such limitation as the law of the latter state supplied, whether the defendant were a resident of New Jersey or not. Even a citizen or corporation resident in New Jersey, against whom the statutory limit had expired in that state, might still be sued in any other state where he or his property might be found, unless the statute of limitations in the latter state prevented; and as to foreign corporations, the limitation of the statute would never attach at all, either in New Jersey or elsewhere. Kirby v. Railroad Co., 14 Fed. 261; Boardman v. Railway Co., 84 N. Y. 157; Olcott v. Railroad Co., 20 N. Y. 210, 75 Am. Dec. 393; Rathbun v. Railway Co., 50 N. Y. 656.

The language of the act seems intended to exclude any such indefinite liability, whether the defendant is a resident or a nonresident, an individual or a corporation. The proviso, it has been held, is attached as a condition of the right of action itself, and not merely as a designation of the ordinary period of limitation for such actions, operating merely as a part of the New Jersey statute of limitations on the remedy alone. If the latter were the proper construction, it might be subject to the extension provided by the general statute of limitation of New Jersey; but the one year proviso would in that case be operative ex proprio vigore in that state alone. On the contrary, however, the proviso must be held to be attached to the right of action itself; and it must, therefore, run with the statute into every forum wherein any action under the statute may be instituted.

This construction of the statutory proviso was laid down in Boyd v. Clark (C. C.) 8 Fed. 849, and it was established by the decision of the supreme court in The Harrisburg, 119 U. S. 199, 7 Sup. Ct. 140, 30 L. Ed. 358, where the statute under consideration was in substantially the same language as the New Jersey statute, and the court there says:

"The time within which the suit must be brought operates as a limitation of the liability itself as created, and not of the remedy alone. It is a condition of the right to sue at all. * * * Time has been made the essence of the right. * * * No question arises in this case as to the power of a court of admiralty to allow an equitable excuse for delay in suing, because no excuse of any kind has been shown."

The same general doctrine was applied by this court in The A. W. Thompson (D. C.) 39 Fed. 115, 117; and in the case of Theroux v. Railroad Co., 64 Fed. 84, 12 C. C. A. 52, it was held that the action would lie in Minnesota, though the two-year limitation of that state had expired, because the statute of Montana, where the death was caused, gave three years, which had not expired; and because the limitation of three years was a part of the statutory right of action, and not a limitation of the remedy merely, and hence, was not governed by the law of the forum like ordinary statutes of limitation. As the proviso in question, therefore, is not a part of the statute of limitations, but a condition of the right of action itself, the extensions of the statute of limitation as regards the remedy during absence or nonresidence, cannot be applied.

In actions in rem in admiralty, state statutes of limitation are not always applied. The time for the enforcement of liens may be enlarged or abridged under special circumstances; and it was presumably in reference to this fact that the supreme court in The Harrisburg, supra, used the language above quoted as regards an excuse for delay. But this is not a libel in rem to enforce a lien, nor yet a bill in equity; but a purely statutory action in personam, and hence must everywhere be governed by the provisions of the statute on which the action rests.

Nor has any sufficient excuse for the delay been shown in this case more than in The Harrisburg, even if the time-limit condition of the right of action itself could in any case be enlarged. The evidence shows no such excuse; and the fact that this libel was not filed until nearly eight months after the decision in the Middleton case on July 28, 1899, very strongly suggests that there was no intent to sue on this claim until after that decision was rendered.

From the time of the accident onward the defendant corporation, maintaining an important line of steamers running to this port, had always abundance of property within this district, by which its appearance here could have been compelled, in accordance with the established practice in admiralty, at any time within the year that the libelant chose to sue. In this district, therefore, where the libelant's suit is brought, there was throughout the year all the opportunity for suit that the statute intended to afford. Under such circumstances there is no sound reason why in this suit founded solely upon the New Jersey statute and brought in a federal court, the

time limit of the statutory proviso should not be applied according to its terms.    To treat the proviso of the statute as a mere question of remedy in the local forum of New Jersey not of itself operative elsewhere would not only be contrary to the repeated decisions above cited, but largely subvert the purpose of the proviso. Its construction as a condition involves no hardship, since the lodgment of process within the year for the purpose of service by the sheriff or marshal, as the case may be, is a sufficient commencement of suit.

The answer has not pleaded this condition of the statute; but if the above view is correct, the technical rule as to pleading the statute of limitations is inapplicable.    On the contrary, where the plaintiff's right is conditional, in strictness he should plead performance of the condition, unless that otherwise sufficiently appears. 5 Enc. Pl. & Prac. 871 ; 4 Enc. Pl. & Prac. 655; Arnson v. Murphy, 115 U. S. 579, 6 Sup. Ct. 185, 29 L. Ed. 491.    Here there has been no surprise on either side; the matter has been fully argued, and if this defense might have been made known earlier, it will be sufficient to deny costs.

Another serious question as to the libelant's right to recover in this action in personam, is based on the recent decision of the supreme court in Homer Ramsdell Transportation Co. v. La Compagnie Generale Transatlantique, 182 U. S. 406, 21 Sup. Ct. 831, 45 L. Ed. 1155, in which, affirming the decision of Judge Choate as referee ([C. C.] 63 Fed. 848), it was held that no such action would lie at law against the owner when the damage arose, as it did in the present case, from the negligence of a pilot taken compulsorily; and the intimation of the dissenting justices in The China (7 Wall. 68, 19 L. Ed. 67) is there quoted, apparently with approval, that the same rule may apply to actions in personam in admiralty.    But as the statutory proviso seems to me to require the dismissal of the libel, it is unnecessary to consider the latter point further.

The libel is dismissed but without costs.

NOTE.

The following opinion of the district court in Middleton against the same defendant sets out the facts in the case:

BROWN, District Judge.    At a little after noon of May 14, 1898, as the respondent's steamship La Touraine, outward bound, was passing Sandy Hook in the Main Ship Channel and going through the passage 300 feet wide leading between the mines established there by the government during the late war with Spain, she sagged along the northerly side of the passage, too near to a small boat moored at one of the buoys, and caused the boat to upset, whereby Robert Middleton, an electrician, one of the men in the boat employed in repairing the mine cables, was drowned.    This libel was filed by his administrator to recover damages under the state statute for the benefit of the deceased's widow and next of kin.

The passage through the mine field, as shown by Exhibit 4, was in the Main Ship Channel, a little to the northward of its middle line, and was 300 feet wide and 4,000 feet long.    It was marked on each side by three white can buoys 2,000 feet apart.    Its western half ran north 15° east, or about 4° more to the northward than the line of the Main Ship Channel.    The small boat with eight men in it, was made fast to an anchor buoy on the north edge of the mine channel about 400 feet westward from the middle

white buoy and about 1,600 feet easterly from the western entrance of the passage. The boat had been moored there three or four hours before, for the purpose of repairing some cables leading from a "junction box", placed on the bottom 60 feet below the surface of the water and held in position by a 1,000-pound anchor, and the boat swinging to the flood tide headed about S. by E. to S. E. The "junction box" had been raised by a lighter and placed in the center of the boat; eight steel cables radiating from it led from over each gunwale, four on each side, some forward, some abeam and some aft. Most of these cables led downwards from the gunwale into the water at only a small angle from a vertical line; but one of them on the starboard side and running southerly was more taut and led higher in the water; and for that reason it had been disconnected from the "junction box" and its end made fast by a small rope to the gunwale, so that the rope might be quickly cut and that cable dropped if necessary; and instructions to that effect had been given to the men in the boat.

There is a difference between the witnesses from the steamer and those from the small boat as to whether the Touraine came in actual contact with the boat itself and rubbed along past it, or whether she only pressed and scraped the cables running from the boat down into the water. The witnesses from the small boat testify very positively that the Touraine rubbed against the starboard gunwale of the boat for a considerable distance; that soon after entering the passage she seemed to be heading for them; that when several hundred feet distant and apparently coming towards them she was hailed to keep off to the southward, but that she did not do so; that her bows when abreast of them were about 20 or 30 feet off and that her side at about amidships sagged against the small boat and rubbed along aft pressing down the starboard gunwale, but without upsetting the boat until just as it cleared the stern of the steamer, when the boat was very suddenly turned over to starboard, the stern going down first; two of the witnesses say that before the side of the steamship came against the boat and while it was some little distance away, a shaking of the boat was felt, (doubtless when the side or bottom of the steamer struck and scraped over one or more of the cables leading from the starboard side), and that a shout was then raised to cut loose the cables, which was done. Others of the boat's witnesses testify that the tauter cable was cut loose before the boats came together, and one of them says he saw it cut. Two of the steamer's witnesses say it was not cut. But none of the steamer's witnesses were watching the small boat when she passed the after part of the steamer; the master and others on the bridge and the boatswain Vincent, amidships, say she was five or six meters off when abreast of the engine room, and aft of that she was not seen by them. Vincent testifies that he saw one of the cables made fast to the boat by a painter, and one of the men with an open knife in one hand and the other hand on the painter. This confirms the small boat's testimony, as to the preparations and instructions for casting loose the tauter cable if necessary; and I have no doubt, therefore, that it was cut loose as the men on the boat testify, though this was probably done after the boat had passed the engine room.

I am satisfied, therefore, that the accident did not arise from any negligence of the men in omitting to cut loose the tauter cable; and I find that at least aft of the engine room and towards the stern of the steamer she sagged against the other starboard cables and against the starboard gunwale of the cable boat, pressing it down somewhat until the boat passed under the steamer's quarter. This is the necessary conclusion not only from the unanimous testimony of the men in the boat, but from the testimony on the part of the steamship, to the effect that abreast of her bows the small boat was only from 6 to 15 meters distant, and that it came nearer as it fell past the bridge and midships to 4 or 5 meters at the engine room. The pilot testifies moreover that the steamer in going through the passage was headed one point to starboard in order to counteract the drifting effect of the flood tide. Had she been so headed, her stern would have been 110 feet nearer to the north line of the passage than her bows, so that in passing along. even without sagging, if her bows went within 30 feet of the boat her side would have struck the boat about at the bridge. I am satisfied

from the steamer's testimony, however, that she did not strike the boat till aft of the engine room. For this reason and for others stated below, I find that the steamer's head was not put to starboard of the line of the passage more than one-half or one-third of a point. So much at least was necessary to prevent the steamer from drifting outside of the main channel to the northward. But even a heading one-third of a point to starboard, her bows being but 30 feet distant, would have made her stern strike the boat, even if the steamer had not been sagging; whereas she was in fact drifting to the northward, having according to her own testimony, drifted at least 100 feet in advancing 1,600, from the time of entering in the southerly one-third of the passage way; i. e. at the rate of 35 feet in a length. Manifestly putting the helm half over to port when abreast of the cable boat, to which the pilot testifies, could not have overcome the approach of the stern from both these causes as she passed by.

It was not this contact with the steamer's side, however, that caused the accident, since the boat was not upset until it cleared under the steamer's quarter and got abreast of the propeller's wheel, when it was suddenly overturned. I have dwelt somewhat upon the circumstance of the contact, however, because it involves the credibility of the small boat's witnesses, on whose testimony depends their freedom from what might possibly be regarded as contributory negligence, if the taut disconnected cable had not been cut loose; although in that aspect of the case the deceased, an electrician, does not appear to have been chargeable with any personal duty. While there may be some errors of detail in the evidence given by the libelant's witnesses, I do not find anything to impeach their trustworthiness in the general scope of their testimony.

What caused the boat to upset as it came abreast of the wheel, is not precisely known. A natural explanation may perhaps be found in the fact that the nearly vertical cables and the small boat itself might yield enough in position to avoid upsetting so long as the pressure from the steamer's side was even and gradual; but the cables, on rising somewhat when they got more free under the steamer's counter, might naturally, almost immediately thereafter, be caught by some one of the projecting propeller blades a little further aft, and the ship's forward motion, though the wheel was stopped, would then suddenly jerk the boat over and downward, just as happened, according to the testimony.

It is not at all essential, however, to understand precisely what it was that caused the boat to upset, since there can be no question that it was some contact with the steamer, and was not by any fault of management on the part of the deceased or his fellow workmen.

The men were lawfully employed and lawfully moored where they were moored, under the supreme military authority in time of war. The passageway, 300 feet in width, was moreover apparently sufficient, and it was the duty of the Touraine to keep away from the moored boat, and by a sufficient margin for safety. There is no evidence that the passageway left for steamers was unreasonably narrow. Within a half hour previous the larger steamer Lucania had passed, outward bound, going about 100 feet from the cable boat; and four or five minutes before the Touraine the German steamer Ems, a little smaller than the Touraine, passed out at about the same distance as the Lucania. The weather was mild and the water calm. The Ems properly stopped her wheel when getting abreast of the cable boat to avoid swamping her, and La Touraine observing this soon afterwards stopped her wheel also, being then probably, according to the pilot's testimony, from 200 to 300 yards west of the cable boat,—200 yards the pilot says, and according to the master's estimates, about 400 or 500 yards astern of the Ems.

It is suggested that the Ems' stopping was an embarrassment to La Touraine. It no doubt caused La Touraine to stop her wheel a little sooner than she would otherwise have done; but this altogether fails as a justification for her getting over to the northerly line of the passage. Before entering the mine channel her master and pilot had received notice from the government patrol boat that a small boat was at work near the middle buoy, and to keep away from her to the southward; the temporary stopping of the wheel of the Ems was known to be a proper maneuver, and was to be expected.

On entering the passage the engines of La Touraine were working at "slow," which gave her a speed as the master testifies, of from eight to ten knots. When abreast of the small boat she must have been going through the water at the rate of six knots and her average speed from the time she stopped her engine until the accident could not have been less than seven knots or about four times the rate of the flood tide.

At that speed La Touraine was perfectly manageable in such weather, and should have maintained her course in about the middle of the passage. Most of the witnesses including the pilot say that the flood current at that time of tide (three-fourths high water) runs west by north, which would cross the mine channel at an angle of two and one-third points; others say that the last of the flood runs more to the northward making an angle of four points with the mine channel, as the pilot says it was. But even reckoning the tide at an angle of four points, computation will show that had the steamer's head been put one point to starboard on entering the passageway, as the pilot finally says it was put, the steamer, going about four times as fast as the tide, would have fully offset the sagging effect of the tide, and would have gone through in a nearly straight path. Had she entered, as the pilot testifies, in the southern third of the mine channel, i. e. 200 feet from the north side and headed one point to starboard, her stern would have passed more than 100 feet from the cable boat, like the large steamers that preceded La Touraine. The necessary conclusion is that the pilot did not turn the ship's head a point to starboard as he ought to have done, and as he testifies he did; but that he starboarded too little to have much effect. The steamer must have been but little over two minutes in going from the entrance of the mine channel to the small boat; and in that time had she headed straight with the line of that channel the tide, even if angling four points, would have set her only about 250 feet to the northward. Entering the southern third of the passage, her stern would not have sagged over to the north line of the passage, even if the tide angled four points, had the steamer been headed a half point to starboard. The master indeed states that the small boat was first noticed bearing on the steamer's starboard bow. Though this would confirm the libelant's witnesses as to her approach, it is so incompatible with the master's other testimony as to her heading to the southerly part of the channel, that I give no weight to it, deeming it a mistake of expression.

The alarm, however, of the men in the small boat on the approach of the Touraine and their shouts to her to keep off, after they had become accustomed to the passage of other previous steamers, including the Lucania and the Ems, so as to feel no apprehension from steamers, is strong evidence that the approach of the Touraine was different from that of all the others, and not properly directed. And this in my judgment was the sole cause of the disaster. There was nothing to prevent the Touraine from heading a point to starboard, even if the tide angled four points, and that, as I have said, would have completely offset any sagging whatever from the effect of the tide, and would have kept both stem and stern from 75 to 100 feet clear of both sides of the passageway. That the Lucania and Ems both did so, is sufficient evidence that the Touraine might have done the same. There is not the least probability that the Ems stopped her wheel long enough to cause any material embarrassment to La Touraine. It was evidently done only while passing the small boat; and from the testimony of the captain of the incoming tug and tow, it is evident that after passing the small boat the Ems went on at or about her full speed.

The testimony of the witness Orloop on his re-examination as to the position of the cable boat inside the mine channel is opposed to all the other evidence; it may be based on the previous position of the anchor before it was moved further to the northward, as was done a day or two preceding this disaster.

The deceased was 29 years of age, for the last five years of his life in the employ of the Edison Electric Company, in good health, and earning about $900 per year, and from his recognized excellence as a workman, he was in the line of promotion. He left a widow, and two sons, of five and two years, respectively. dependent wholly on his support.

I allow a decree for the libelant for the sum of $12,500, with costs.