FULTON v. PRESIDENT, ETC., OF INSURANCE CO. OF NORTH
AMERICA.

(District Court, S. D. New York. January 25, 1904.)

1. MARINE INSURANCE—LIMITATION OF RISK TO INLAND WATERS—WATERS OFF
   CONEY ISLAND.
   The waters of the Atlantic Ocean off Coney Island are not "inland
   waters," within the meaning of a policy of marine insurance on a house-
   boat expressly limiting the risk to loss or disaster occurring while the boat
   is within inland waters, although such waters are within the lines estab-
   lished by authority of Congress for the application of the statutory rules
   governing inland navigation; such lines being artificial, and established
   for a special purpose only.

In Admiralty. Action on policy of marine insurance.

Edwin C. Dusenbury, for libellant.

Black & Kneeland, for respondent.

ADAMS, District Judge. The libellant effected a contract of in-
surance with the President and Directors of the Insurance Company
of North America, Philadelphia, to cover certain marine risks on his
houseboat Mon Mon, during a year commencing on the 30th day of
April, 1902. This action was brought to recover the agreed value of
the boat, $700, less $100 particular average, by reason of its loss, while
the policy was in force, under circumstances alleged in the libel, as
follows:

"Third: On information and belief, that on or about June 14, 1902, while
within the waters covered by said policy and while proceeding therein, said
houseboat 'Mon Mon' was by the perils of the seas wrecked and totally lost,
under the following circumstances: said houseboat had been lying in
Gravesend Bay and was on her way under tow to Sheepshead Bay by way
of the south shore of Coney Island. The house portion of said houseboat was
constructed upon a deck or flooring, supported by two hulls arranged in the
manner of a catamaran. When about opposite the Oriental Hotel on said
Coney Island and within a short distance of the shore, the starboard hull
of said catamaran, by reason of some cause unknown to libellant, suddenly
sank, exposing the upper works of said boat to the beating of the waves, as a
result of which such upper works, being the house portion of said boat, were
shortly thereafter carried away by the seas and lost. That the tug which had
been towing said houseboat was not powerful enough to tow it after it had
become partially submerged as aforesaid, and the said houseboat was there-
fore of necessity anchored off the Oriental Hotel where the accident occurred;
and that before the libellant was able to secure a tug to tow the said house-
boat to some more sheltered anchorage, first the upper portion of said house-
boat and then the hulls thereof were carried away by the seas and totally
lost."

The answer denies that the vessel was lost while within the waters
covered by the policy and while proceeding therein. Otherwise the
allegations of the libel are admitted, including ones to the effect that
the boat was seaworthy, and lost from sea perils. The boat was sunk
about a quarter of a mile from the shore of Coney Island, opposite
the Oriental Hotel.

The defence rests upon the denial stated and the following pro-
visions of the policy:

"Warranted confined to the inland waters of New Jersey, New York and
Long Island. * * *. Any deviation beyond the limits named in this policy

shall not void this policy; but no liability shall exist during such deviation; and upon the return of said vessel within the limits named herein, no disaster having occurred, this policy shall be and remain in full force and effect, unless a disaster occurs while deviating."

The question to be determined is, whether the boat was lost within the waters covered by the policy.

The libellant contends that the waters where the boat was lost, were inland (a) under the statutory definition applicable to New York Harbor and (b) under the general definition of such waters adopted by the courts.

The libellant relies, to sustain his first contention, upon an Act of Congress, approved February 19, 1895, as follows:

"Chap. 102.—An Act to adopt special rules for the navigation of harbors, rivers and inland waters of the United States, except the Great Lakes and their connecting and tributary waters as far east as Montreal, supplementary to the Act of August nineteenth, eighteen hundred and ninety, entitled 'An Act to adopt regulations for preventing collisions at sea.'

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That on and after March first eighteen hundred and ninety-five, the provisions of sections Forty-two hundred and thirty-three, forty-four hundred and twelve, and forty-four hundred and thirteen of the Revised Statutes and regulations pursuant thereto shall be followed on the harbors, rivers and inland waters of the United States.

"The provisions of said sections of the Revised Statutes of the United States and regulations pursuant thereto are hereby declared special rules duly made by local authority relative to the navigation of harbors, rivers and inland waters as provided for in Article thirty, of the Act of August nineteenth, eighteen hundred and ninety, entitled 'An Act to adopt regulations for preventing collisions at sea.'

"Sec. 2. The Secretary of the Treasury is hereby authorized, empowered and directed from time to time to designate and define by suitable bearings or ranges with light houses, light vessels, buoys or coast objects, the lines dividing the high seas from rivers, harbors and inland waters.

"Sec. 3. Collectors or other chief officers of the customs shall require all sail vessels to be furnished with proper signal lights. Every such vessel that shall be navigated without complying with the Statutes of the United States, or the regulations that may be lawfully made thereunder, shall be liable to a penalty of two hundred dollars, one-half to go to the informer; for which sum the vessel so navigated shall be liable and may be seized and proceeded against by way of libel in any district court of the United States having jurisdiction of the offense.

"Sec. 4. The words 'inland waters' used in this Act shall not be held to include the Great Lakes and their connecting and tributary waters as far east as Montreal; and this Act shall not in any respect modify or affect the provisions of the Act entitled 'An Act to regulate navigation on the Great Lakes and their connecting tributary waters,' approved February eighth, eighteen hundred and ninety-five.

"Approved, February 19, 1895."

28 Stat. 672 [U. S. Comp. St. 1901, pp. 2899, 2900].

Under this authority, the Secretary of the Treasury has established lines as follows:

"Lines Establishing Harbors, Rivers, and Inland Waters of the United States, within Which the Inland Rules are to Apply.

"(Bearings are magnetic and given approximately).

"New York Harbor: From Navesink (southerly) lighthouse NE ⅝ E., easterly, to Scotland light-vessel; thence NNE ½ E. through Gedney Channel Whistling Buoy to Rockaway Point Life-Saving Station."

Commerce and Labor—Navigation Laws of the United States, p. 354, § 369.

These lines fix the outer boundary between three and four miles he eastward of the Oriental Hotel.

he libellant urges that, although the designation was made by 'ecretary of the Treasury under an act to regulate navigation of rs, rivers and inland waters, with a special view to preventing .usions, he must have had in mind the ordinary and accepted definition of inland waters, as well as the physical conformation of the ad-. jacent land and the harbor bottom, and further urges that the line so fixed has been adopted by the courts and has not by them been limited to the sole purpose of regulating vessels' lights, citing Lennan v. Hamburg-American Steamship Co., 73 App. Div. 357, 77 N. Y. Supp. 60, and Middleton v. La Compagnie Generale Transatlantique, 100 Fed. 866, 41 C. C. A. 98. These actions were brought, however, to recover damages for loss of life and the question now under consideration was not presented for decision, but one of territorial jurisdiction, and it was held that the courts had jurisdiction to determine the particular questions there involved. The expressions used by the courts, so far as they apparently bear upon the question here, are mere dicta and can have little weight in influencing decision.

The libellant next contends, that the ordinary and accepted definition of the term "inland waters," as laid down by the courts, includes the waters within which the loss occurred, citing Cogswell v. Chubb, 1 App. Div. 93, 36 N. Y. Supp. 1076, affirmed 157 N. Y. 709, 53 N. E. 1124. That authority, however, rather supports the respondent's claim, that the accident did not occur in waters covered by the policy. That case was brought to recover for loss of a steam yacht, which was insured under a policy which provided:

"Warranted to navigate only the inland waters of the United States and Canada, and not below the Thousand Islands."

It appeared by the record, that the loss occurred upon the lower New York Bay, after the vessel returned from a trip on the open waters of the Atlantic Ocean, beyond the lightships. The court said, pages 94, 95, 1 App. Div., page 1077, 36 N. Y. Supp.:

"The effect of the whole evidence is that the vessel went out of inland waters. Such waters are canals, lakes, streams, rivers, watercourses, inlets, bays, etc., and arms of the sea between projections of land. That ordinary and accepted signification of the words 'inland waters' must be considered the sense in which the parties used them in their contract of insurance, unless by agreement or understanding some other was assigned to them; and there is nothing in the record to show that a different or wider meaning was intended to be given them. Going to the open ocean and then returning was a plain breach of the warranty, the consequence of which was to avoid the policy, for, hard as the artificial rule may be, it is too firmly settled to be questioned that the breach of an express warranty, whether material to the risk or not, whether a loss happens through the breach or not, absolutely determines the policy and the assured forfeits his rights under it."

The policy in suit contained a provision for the resumption of the underwriter's liability, when the vessel should return to inland waters, and, of course, there was no forfeiture. The language of the court above is significant, however, of the absence of the underwriter's liability, when a vessel is beyond the confines of the risk. It seems that the libellant's contention has no authority to support it.

The policy here was a New York contract, presumably framed with a view to the definition made by the courts of the state, and it can not, apparently, be affected by the laws of the United States made for a purpose not within the purview of the parties at the time of the contract. This loss occurred over three miles to the eastward of Norton's Point, the western end of Coney Island and the natural outer boundary of inland waters belonging to New York Bay. Ocean waters can not be changed to inland waters by legislation particularly designed to secure safety from collision in navigation.

Moreover, the vessel was manifestly not intended for navigation upon the ocean. In the Century Dictionary, it is defined:

"House-boat. A boat fitted up as a house, and commonly more or less resembling one in form and arrangements, for permanent or temporary habitation. Such boats have long been the only dwellings of many thousands of families in the waters of some eastern countries, intended either to be stationary or to be moved by towing or by oars or sweeps, and in Hindustan and Burma are known as house-boats. They abound even more largely in China; but the boat distinctively called a house-boat there is one for use in excursions or in traveling. The English house-boat is an adaptation of the latter idea, being supplied with all conveniences for living on board as in a house during a prolonged excursion, especially on the Thames."

And in Funk and Wagnalls' Standard Dictionary thus:

"House-boat. 1. A covered boat fitted up as a dwelling, or a boat with a deck-cabin suitable for a dwelling; a floating dwelling. 2. In China, a private boat kept for the use of a commercial house. * * *"

Houseboats are not as frequent in this country as abroad, but it is well known that here, as well as elsewhere, they are adapted for use in protected waters only.

There is no room in this policy for the contention that the well-established rule relating to the construction of ambiguous provisions against the insurer, should be applied. The provisions excluding ocean risks, are perfectly plain and incapable of construction, which would tend to give them a meaning different from the one expressed. Mark v. Home Ins. Co. (D. C.) 52 Fed. 170.

It would seem anomalous to hold that a policy of insurance which provides against risks incident to inland waters, could properly be deemed to secure indemnity against risks incurred upon the open ocean, though within the waters deemed inland for certain navigation purposes.

Libel dismissed.