Argued September 17; reversed November 5, 1936; argued on re-
hearing February 18; former opinion reversed and
lower court affirmed April 6; rehearing
denied June 2, 1937

ATKINSON ET AL. *v.* STATE TAX COM-
MISSION ET AL.

(62 P. (2d) 13, 67 P. (2d) 161)

462

*Howard P. Arnest*, of Portland, for appellants.

*Carl E. Davidson*, Assistant Attorney General (I. H. Van Winkle, Attorney General, on the brief), for respondents.

RAND, J. The facts in this case are very similar to those in *Winston Bros. Company et al. v. State Tax Commission of Oregon et al.* on this day decided, and the law of that case is decisive of this.

In this case, as in the former one, the state seeks to impose a tax upon the profits realized by the plaintiffs in the performance of a contract entered into by them with the War Department. In the other case, the work was done in the reconstruction of a jetty, while in this case the work was done in the construction of a dam, locks and ship canal in the Columbia river at Bonneville, Oregon.

The plaintiffs here, as in the former case, are nonresidents of the state.

The evidence shows that the dam, locks and ship canal are being constructed as an aid to navigation and it is undisputed that all the operations of the plaintiffs here, under their contract, were entirely performed on land the title to which had been acquired either by condemnation, by grant of the state, or by purchase from private individuals, except a small portion thereof which was done on the south channel of the river lying between Bradford island and the mainland, which channel, before the work was done, was navigable for small craft.

There are two statutes not referred to in the other case, both of which are applicable to show that the fee in these lands was acquired by consent of the state. These are sections 60-1301 and 60-1303, Oregon Code 1930, which read as follows:

"Whenever it shall become necessary for the United States to acquire the title to any real property in this state belonging to any individual or corporation, for the purpose of constructing any canal or locks, or any

other public improvement authorized to be made by any act of congress, and such property cannot be purchased from the owner for that purpose, it shall be lawful for any authorized agent of the United States to enter upon, examine, and select a quantity of land, fully sufficient in length and breadth for such canal and locks, or other public improvements, and such authorized agent may proceed in the mode prescribed in chapter IV of Title XXXVII to have such property appropriated, and the compensation therefor determined and paid.''

''Consent is hereby given to the United States to purchase or otherwise acquire any lands within the state of Oregon for the purpose of erecting thereon any needful public buildings, under authority of any act of congress; and the United States may enter upon and occupy any such lands which may be purchased or otherwise acquired, and shall have the right of exclusive jurisdiction over the same; provided, that all process, civil or criminal, issuing under authority of the laws of the state of Oregon, may be executed by the proper officers thereof upon any person or persons amenable to the same within the limits of the land so acquired, in like manner and to the same effect as if this act had not been passed.''

It will thus be seen that the title, whether acquired by purchase or condemnation, was acquired with the consent of the state and, since all work and operations by the plaintiffs were performed on lands the fee to which had been acquired by the federal government, the state, under the rulings in the Winston Bros. Company case, has no jurisdiction over such lands other than merely the right to serve process and has no legislative authority to tax any of the operations thereon or any income arising from any work done thereon.

Defendants argue that the federal government may acquire exclusive jurisdiction over territory within a state only in one of two ways: First, by purchase with

consent of the state, or second, by cession of jurisdiction by the state. We think that both of these elements are present in this case and that the purchase was made with the consent of the state and that jurisdiction was ceded to the federal government by the state.

The rule applicable to the concurrent jurisdiction over a bridge constructed over navigable waters under the authority of the War Department has no application here. In such case, the government may construct a bridge over navigable waters with or without the consent of the state under the power conferred upon Congress by Article I, section 8, subdivision 3, which gives to Congress the power to regulate commerce with foreign nations, and among the several states and with the Indian tribes. The construction of a bridge over a navigable stream, whether done with or without the consent of the state, is an exercise of power under said constitutional provision and, if the bed of the river on which the piers are laid is occupied by the federal government in the construction of the bridge without the consent of the state, its occupancy is authorized, but in that case both the state and the federal government retain concurrent jurisdiction thereover. This is clearly pointed out in *Stockton v. Baltimore & N. Y. R. Co.*, 32 Fed. 9, where the court said:

"* * * It is argued that this is the only constitutional method by which the United States government can obtain the possession and use of lands within a state, especially of lands belonging to the state.

"The argument, however, is directed to the acquisition of territory, with exclusive jurisdiction over the same, and is entirely sound in that regard. But it does not touch the question as to the power of the United States to acquire the mere use of land without exclusive jurisdiction therein. Nearly all the powers of govern-

ment are exercised over territory in which the United States and the several states have concurrent jurisdiction. It is only in exceptional cases that the United States desires to have exclusive jurisdiction, and a consequent cession of territory. It is very true that the consent of the state legislature is required in order to give the United States this exclusive jurisdiction. But that is all. It is not required when exclusive jurisdiction is not sought. On the contrary, the government, if it sees fit, may condemn land for its purposes without the consent of the state. Thus it was decided in the supreme court in the case of Kohl v. U. S., 91 U. S. 367, that the government of the United States may exercise the right of eminent domain within a state, for the purpose of condemning land for the use of a post-office building, and may, for this purpose, resort to its own courts. In such a case, there cannot be a doubt that the post-office building could be erected and used by the government without asking the consent of the state legislature. Such consent would, indeed, be necessary to vest in the United States exclusive jurisdiction over the post-office building and grounds; but it would not be necessary to enable the government to use the property for the purposes for which it was acquired. And so of any other property wanted for a public purpose; the consent of the legislature is not necessary to its acquisition, or to its use; but only to the exclusion of state jurisdiction over the place. That jurisdiction, if allowed to remain, will extend to the punishment of crimes committed against state laws therein, and to the service of state process, but, of course, cannot interfere with the execution of the United States laws, nor with the performance, by United States officers and agents, of the duties devolved upon them.

"In short, cession by a state is only necessary to extinguish its jurisdiction, in whole or in part, and is not necessary to the use of land by the United States for public purposes,—subject, like all lands within the limits of the Union, to the concurrent jurisdiction of both governments; that of the United States being supreme. The laws of the latter are supreme everywhere,

in the states as well as in the territories of the United States; but have exclusive force, within the states, only in such places as have been ceded by them.

"The argument based upon the doctrine that the states have the eminent domain or highest dominion in the lands comprised within their limits, and that the United States have no dominion in such lands, cannot avail to frustrate the supremacy given by the constitution to the government of the United States in all matters within the scope of its sovereignty. This is not a matter of words, but of things. If it is necessary that the United States government should have an eminent domain still higher than that of the state, in order that it may fully carry out the objects and purposes of the constitution, then it has it. Whatever may be the necessities or conclusions of theoretical law as to eminent domain or anything else, it must be received as a postulate of the constitution that the government of the United States is invested with full and complete power to execute and carry out its purposes. And as one of these purposes is the regulation of commerce among the several states, and as that involves the needs and ways of intercommunication, it follows that congress may provide for these necessities whether the states co-operate and concur therein or not."

The defendants also cite *Fort Leavenworth Railroad Co. v. Lowe*, 114 U. S. 525 (29 L. Ed. 264, 5 S. Ct. 995), as a decision sustaining the right of the state to levy the tax in question. We do not so read that opinion. Fort Leavenworth was established on lands the title to which was in the United States at the time of its establishment, and, in the act of admitting Kansas as a state, there was no reservation of federal jurisdiction over the Fort Leavenworth Military Reservation. Later, the state of Kansas ceded to the United States jurisdiction over the reservation but reserved to itself the right to tax private property therein and, because of those facts which are entirely dissimilar from those involved here,

it was held that the property and franchises on the reservation of the railroad company plaintiff were subject to tax by the state. It was also held that:

"When the United States acquire lands within the limits of a State by purchase, with the consent of the Legislature of the State, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings, the Constitution confers upon them exclusive jurisdiction of the tract so acquired; but when they acquire such lands in any other way than by purchase with the consent of the Legislature, their exclusive jurisdiction is confined to the erections, buildings and land used for the public purposes of the Federal Government." (Paragraph one of the syllabus.)

In the body of the opinion, the court said:

"These authorities are sufficient to support the proposition which follows naturally from the language of the Constitution, that no other legislative power than that of Congress can be exercised over lands within a State purchased by the United States with her consent for one of the purposes designated; and that such consent under the Constitution operates to exclude all other legislative authority."

This principle, we think, is controlling here. From this it follows that the state of Oregon had no right to impose the tax in question here. The judgment of the lower court will, therefore, be reversed and the cause is remanded to the court below to enter a judgment in favor of the plaintiffs.

CAMPBELL, C. J., not sitting.

BELT, ROSSMAN and BAILEY, JJ., concur.

KELLY and BEAN, JJ., dissent.

Argued on rehearing February 18; former opinion reversed and lower court affirmed April 6, 1937

ON REHEARING

(67 P. (2d) 161)

*Howard P. Arnest*, of Portland, for appellants.

*Carl E. Davidson*, Assistant Attorney General, of Portland (I. H. Van Winkle, Attorney General, of Salem, on brief), for respondents.

*James R. Bain*, District Attorney of Multnomah county, and *Frank S. Sever*, Deputy District Attorney, on brief amici curiae.

BAILEY, J. Oral argument on the rehearing of this matter, following granting of petition of the defendants and respondents, State Tax Commission and members thereof individually, was practically limited to the question of whether the federal government has exclusive legislative jurisdiction over the site, within territorial limits of the state of Oregon, of the Bonneville dam project. The other contention stressed by the plaintiffs and appellants in their original briefs and at the first hearing, and decided adversely to them in our former opinion, was that in the work which they had performed in construction of the Bonneville dam they had acted as an instrumentality or agency of the federal government and that therefore their income derived from payment for such work was not subject to be taxed by the state of Oregon as personal income

of the plaintiffs, co-partners who are non-residents of the state of Oregon. This contention, although not urged on the rehearing, was not abandoned. We shall not discuss the matter further, except to say that we adhere to our former opinion in this regard, further supported by the recent decision in *Silas Mason Co. v. State Tax Commission,* 188 Wash. 98 (61 P. (2d) 1269).

The Bonneville dam project extends from the banks of the Columbia river on the Washington side, across the main or north channel of the river, thence across Bradford island and the south channel of the Columbia river, known as Bradford slough, to the banks of the river in the state of Oregon. The territorial boundary of Oregon at the north is "the middle channel of said river, and, where it is divided by islands, up the middle of the widest channel thereof," which widest channel at this point is the water between Bradford island and the Washington banks.

The entire area of Bradford island was acquired by the federal government, either by purchase or condemnation. An extensive tract of mainland was also acquired by the federal government on the Oregon side of the river adjoining Bradford slough, some of which land was used in connection with construction of certain units of the dam works, and other parts were reserved for present use by army engineers and other federal employees engaged in work on the dam, for residence purposes, and for later occupancy by those having charge of the operation and maintenance of the power house and locks. The record does not show what lands in the state of Washington, if any, were acquired for this project. Construction of the dam is under the direction of the war department of the United States.

The major unit of the dam structure is built across the main or north channel of the Columbia river between Bradford island and the Washington banks and is some distance upstream from the combined dam and power plant being constructed across the south channel, or Bradford slough. At the site of this latter structure the south channel is some 275 feet to 350 feet wide, measured between the meander lines as run by federal surveyors. The record does not disclose the distance from bank to bank during average high water.

The appellants early in 1934 entered into a contract with the United States through the war department "for the furnishing of all plant, labor and materials, and performing the work in construction and maintenance of earth cofferdams, construction of cofferdams, sluice-way, construction of grade crossing, grading of roadway and excavation and removal of earth for site of power house and navigation locks on the Columbia river" on land of the federal government and the bed of Bradford slough, designated as the Bonneville dam project. Their contract with the government was performed prior to the institution of this proceeding.

In the construction of the south unit of the dam, and this is also probably true of the north unit, it was necessary to build cofferdams on each side of the permanent structure. In the Bradford slough area one of the cofferdams is approximately 600 feet upstream from the permanent dam structure, and the other is some 800 feet downstream. The map which was introduced as an exhibit shows that each end of the dam and power plant in Bradford slough has been built on lands purchased by the federal government, at the north on Bradford island and at the south on the

Oregon mainland. The locks and the canal in connection therewith are constructed at the south of the dam across Bradford slough and to some extent over and across property purchased and owned by the federal government.

In the former opinion it was held that the federal government had exclusive jurisdiction over the site of the Bonneville dam project in the state of Oregon and that the profits realized by plaintiffs from the performance of their contract were not subject to taxation by the state of Oregon. This is the only question here involved. In arriving at a solution of the problem it is, however, necessary to determine whether or not the federal government had, during the time that plaintiffs were engaged in performing their contract, exclusive legislative jurisdiction over the entire area, within the territorial limits of the state of Oregon, of the Bonneville dam project or certain parts of it.

Article I, § 8, of the constitution of the United States, provides that "Congress shall have power . . . to exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of Congress, become the seat of government of the United States, and to exercise like authority over all places purchased by consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings."

The major part of the dam structure is built upon land underlying the waters of the two channels of the Columbia river. It is being constructed for the purpose of aiding navigation and for the development of hydroelectric power. The height of the dam has neces-

sitated construction of parts of the base thereof upon the banks of Bradford slough and the banks of the Columbia river in Washington and Oregon.

■ Both channels of the Columbia river within the Bonneville dam project are navigable waters. And since they are navigable, the soil underneath them below ordinary high-water mark within the territorial limits of the state of Oregon belongs to this state: *State v. Imlah,* 135 Or. 66 (294 P. 1046) ; *Cook v. Dabney,* 70 Or. 529 (139 P. 721) ; *United States v. Utah,* 283 U. S. 64 (75 L. Ed. 844, 51 S. Ct. 438) ; *Pollard's Lessee v. Hagan,* 3 How. 212 (11 L. Ed. 565) ; *Shively v. Bowlby,* 152, U. S. 1 (38 L. Ed. 331, 14 S. Ct. 548).

The title to lands under the water of these channels within the territorial limits of the state of Oregon has not been acquired by the federal government from the state of Oregon by purchase, condemnation or otherwise. Nor has the state of Oregon ceded to the national government exclusive legislative jurisdiction over the waters of these channels.

In *United States v. Bevans,* 3 Wheat. 336 (4 L. Ed. 404), a question arose as to whether the state of Massachusetts or the United States had jurisdiction over a crime committed on a warship "lying at anchor, in the main channel of Boston harbor". In his opinion therein, at page 385, Chief Justice Marshall said:

"What then is the extent of jurisdiction which the state possesses? We answer, without hesitation, the jurisdiction of a state is co-extensive with its territory; co-extensive with its legislative power. The place described is unquestionably within the original territory of Massachusetts. It is, then, within the jurisdiction of Massachusetts, unless that jurisdiction has been ceded to the United States."

■ In considering the question of whether the state of Oregon has legislative jurisdiction over the waters

of Bradford slough and that part of the north channel of the Columbia river within the territorial boundaries of the state, some assistance may be had from the decision in *Gromer v. Standard Dredging Company*, 224 U. S. 362 (56 L. Ed. 801, 32 S. Ct. 499). In that case there was a dispute as to the power of Porto Rico to tax certain machinery and boats which were in the harbor of San Juan engaged in dredging operations in pursuance of a contract with the United States government. The opinion pointed out that the purpose of certain federal legislation was to give to Porto Rico local self-government and to confer on that insular possession "an autonomy similar to that of the states and territories, reserving to the United States rights to the harbor areas and navigable waters for the purpose of exercising the usual national control and jurisdiction over commerce and navigation". Then followed this pertinent statement, "The United States could have reserved government control and exercised it as it does in instances, by the consent of the states, over certain places in the states devoted to the governmental service of the United States." The court further held that such reservation had not been made by the federal government, and concluded that Porto Rico had jurisdiction to tax the personal property hereinbefore mentioned. Three of the justices dissented on the ground that the property had not acquired a situs within the jurisdiction of Porto Rico for taxation purposes, yet as to the above proposition said: "We agree with the decision of the court that the territory of Porto Rico has jurisdiction for taxing purposes over the harbor and waters in question and that the use of the property for government purposes does not exempt it from taxation." The statements here quoted are significant, for the reason that the court was dealing with the matter

of legislative jurisdiction over navigable waters. The only conclusion which can be drawn from the language of the majority opinion is that the federal government does not acquire exclusive legislative jurisdiction over the waters within the boundaries of the state, without consent of the state.

In *Middleton v. La Compagnie Generale Transatlantique*, 100 Fed. 866, the circuit court of appeals for the second circuit had before it the question of whether an administrator could maintain an action for damages sustained by the widow and next of kin in the case of a death due to negligence at a place in the harbor within three-fourths of a mile of Sandy Hook. The court, after pointing out that there could be no recovery in a court of admiralty under the general maritime law for loss of life, stated that it must be shown that the accident happened at a place within the legislative jurisdiction of some state whose law permits such recovery. The court predicated its conclusion in the case on the assumption, as contended for by the plaintiff, that the United States purchased "the island or cape of Sandy Hook from shore to shore, bounded on all other sides [than the south] by the sea and Sandy Hook Bay".

It was there held, however, that in purchasing this property the United States did not obtain any land below low-water mark. The court said:

"The purchase, if there was a purchase, and the act of cession, if it be susceptible of a construction which will bring it into harmony with the constitution, and thus make it a valid 'consent to the purchase,' gave to the United States the right to exercise exclusive legislation only in so much of the state of New Jersey as was thereby transferred. Over all other places within the limits of that state her legislative power remains as full and complete as it was before, except that it must be so exercised as not to destroy or impair the

forts, arsenals, and other structures erected on the land transferred to the federal government for military or public purposes. The accident happened, as we have seen, upon inland waters which were within the limits of the state (conceded to be so by the neighboring state and by the United States) before the act of cession; and, since that act does not purport to transfer the locality in question, the public laws of New Jersey are in full force there, and were so at the time of the accident.''

The above case was cited with approval by the supreme court of the United States in *Hamburg-American Steamship Co. v. Grube*, 196 U. S. 407, 415 (49 L. Ed. 529, 25 S. Ct. 352), in the following language:

''Moreover, as was held by the circuit court of appeals for the second circuit, in Middleton v. La Compagnie Generale Transatlantique, 100 Fed. Rep. 866, the act did not purport to transfer jurisdiction over the littoral waters beyond low water mark, and for the purposes of this case the public laws of New Jersey must be regarded as obtaining there, whether enacted prior or subsequent to the cession.''

In the case of *Bigelow v. Nickerson*, 70 Fed. 113 (30 L. R. A. 336) the circuit court of appeals, seventh circuit, had before it the question of whether a statute of Wisconsin giving the right of recovery for death from injury applied to a death which occurred on the waters of Lake Michigan. It was contended that the law was in conflict with the provisions of the constitution of the United States granting to Congress the power of exclusive legislation in all cases of admiralty and maritime jurisdiction. In holding that the Wisconsin act was not violative of this constitutional provision the court said:

''In the case of Illinois Cent. R. Co. v. Illinois, 146 U. S. 387, 13 Sup. Ct. 110, and in the case of Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, it is said to be the

settled law of this country that 'ownership of, and dominion and sovereignty over, lands covered by tide waters or navigable lakes, within the limits of the several states, belong to the respective states within which they are found, with the consequent right to use or dispose of any portion thereof, when that can be without substantial impairment of the interest of the public in such waters, and subject to the paramount right of congress to control their navigation, so far as may be necessary for the regulation of commerce.' In the latter case it is said (page 58, 152 U. S., and page 548, 14 Sup. Ct.) that, upon admission of states into the Union, the 'administration and disposition of the sovereign rights in navigable waters, and in the soil under them,' passed to the control of the states within whose boundaries such waters were included. See, also, Mann v. Land Co., 153 U. S. 273, 286, 14 Sup. Ct. 820.

"The grant to the United States, in the constitution, of all cases of admiralty and maritime jurisdiction, does not extend to a cession of the waters in which those cases may arise, or of general jurisdiction over them. *Congress may pass all laws which are necessary for giving the most complete effect to the exercise of the admiralty and maritime jurisdiction granted to the government of the Union, but the general jurisdiction over the place, subject to this grant, adheres to the territory, as a portion of territory not yet given away, and the residuary power of legislation will still remain in the state.* U. S. v. Bevans, 3 Wheat. 336. We are therefore of opinion that the surrounding states, within the limits prescribed in their respective organic acts, have sovereign rights in and over the navigable waters of Lake Michigan, subject to the paramount right of the federal government to regulate navigation and commerce between the states and with foreign nations. *The right of the state to legislate and to enforce its laws is plenary, within the boundaries prescribed, limited and controlled only by the paramount law of the nation. There does not necessarily result any conflict. Both jurisdictions can coexist in the same plane in complete harmony.*" [Italics supplied.]

After discussing further the jurisdiction of courts of admiralty, the opinion thus continues:

"We think the clear result of the authorities to be that the sovereignty of the state of Wisconsin extends to the middle of the lake, and that its laws, so far as they do not conflict with the laws of the United States passed in the regulation of commerce and of navigation, are operative within its prescribed boundary."

*Stockton v. Baltimore & N. Y. R.*, 32 Fed. 9, was an action brought on behalf of the state of New Jersey in the name of its attorney general. A question there arose as to the right of the Staten Island Rapid Transit Railroad Company, under permission granted by Congress to said company and the named defendant, or either of them, to erect a bridge "across Arthur kill, between New Jersey and Staten island, in the state of New York, upon the lands of the state [of New Jersey] situate on the shore, and under the waters of said kill," to proceed with the construction of such bridge without the consent of the state of New Jersey and without compensating that state for taking the bed of the stream on which the bridge supports were to be placed. The opinion in the case was written by Justice Bradley, a member of the United States supreme court sitting as a circuit judge. After disposing of several minor matters he said:

"The most strenuous objection, however, to the exercise of the power in this case, and in the manner proposed, is based on the fact that the piers of the bridge are to rest, and the bridge is to stand, on land which belongs to the state, and that no compensation is proposed to be made for the taking thereof. It is contended that, if the land of the state can be taken at all, (which is denied,) it can, at most, only be taken, like other private property, after just compensation has been made."

This contention was met by pointing out that although the state owned the lands "under water of the navigable streams and waters," said lands were held in trust by the state for the public uses of navigation and fishery, and were therefore *publici juris*. It was further stated that the constitutional prohibition against the taking of *private property* for a public use without just compensation did not apply to the taking by the federal government, for a purpose such as involved in that case, of public property held in trust by the state. The court there held "that the power to regulate commerce between states extends, not only to the control of the navigable waters of the country, and the lands under them, for the purpose of navigation, but for the purpose of erecting piers, bridges, and all other instrumentalities of commerce which, in the judgment of Congress, may be necessary or expedient," and that this bridge was being erected pursuant to legislation of Congress acting within its constitutional powers.

It was also urged by the petitioner therein that the state could be ousted by the federal government of exclusive jurisdiction over the area included in the bridge project only by purchase of the land by the government with the consent of the state or by cession by the state of jurisdiction over the same. The court answered this argument by saying that the state itself cannot be refusing to give its consent prevent the federal government from carrying out its constitutional functions. In further answer to the above contention, after referring to the provisions of the federal constitution hereinabove quoted, the court observed:

"It is argued that this is the only constitutional method by which the United States government can obtain the possession and use of lands within a state, especially of lands belonging to the state.

"*The argument, however, is directed to the acquisition of territory, with exclusive jurisdiction over the same, and is entirely sound in that regard.* But it does not touch the question as to the power of the United States to acquire the mere use of land without exclusive jurisdiction therein. Nearly all the powers of government are exercised over territory in which the United States and the several states have concurrent jurisdiction. *It is only in exceptional cases that the United States desires to have exclusive jurisdiction, and a consequent cession of territory.* It is very true that the consent of the state legislature is required in order to give the United States this exclusive jurisdiction. But that is all. It is not required when exclusive jurisdiction is not sought. On the contrary, the government, if it sees fit, may condemn land for its purposes without the consent of the state. Thus it was decided by the supreme court in the case of Kohl v. U. S., 91 U. S. 367, that the government of the United States may exercise the right of eminent domain within a state, for the purpose of condemning land for the use of a post-office building, and may, for this purpose, resort to its own courts. In such a case, there can not be a doubt that the post-office building could be erected and used by the government without asking the consent of the state legislature. Such consent would, indeed, be necessary to vest in the United States exclusive jurisdiction over the post-office building and grounds; but it would not be necessary to enable the government to use the property for the purpose for which it was acquired. *And so of any other property wanted for a public purpose; the consent of the legislature is not necessary to its acquisition, or to its use; but only to the exclusion of state jurisdiction over the place.* That jurisdiction, if allowed to remain, will extend to the punishment of crimes committed against state laws therein, and to the service of state process, but, of course, can not interfere with the execution of the United States laws, nor with the performance, by United States officers and agents, of the duties devolved upon them." [Italics supplied.]

In *United States v. Utah,* supra, the court said:

"The government also refers to proceedings since Utah became a state, with respect to governmental investigations, operations under placer claims, and withdrawals for power and reservoir sites. It is not necessary to review these transactions in detail, as nothing that has been done alters the essential facts with respect to the navigability of the streams, and the United States could not, without the consent of Utah, divest that state of title to the beds of the rivers which the state had acquired. Nor has Utah taken any action which could be deemed to estop the state from asserting title."

Section 60-1302, Oregon Code 1930 (Laws 1874, p. 10), grants to the governor of Oregon authority and power to convey to the United States title to land belonging to the state and covered by the waters of the United States, not exceeding 10 acres in any one tract, as the site of a lighthouse, beacon or other aid to navigation, upon application made to him by a duly authorized agent of the United States, and further grants him authority "to cede to the said United States jurisdiction over the same," reserving, however, to the state the right to serve thereon civil or criminal process issuing under authority of the state. No application has been made to the governor of this state or to the legislature for conveyance of any part of the bed of either the north or south channel of the Columbia river within the project, or for cession to the federal government of jurisdiction over the same.

In *Ryan v. State,* 188 Wash. 115 (61 P. (2d) 1276), a case involving the right of the state of Washington to tax contractors in relation to their work performed on the Grand Coulee dam, the court said:

"By the enabling act of Congress, passed February 22, 1889, the territory of Washington became the state

of Washington. Subject to the limitations and restraints of the federal constitution, the state, as such, has all the sovereign powers of independent nations over all persons and things within its territorial limits. Sturges v. Crowninshield, 4 Wheat. 122, 4 L. Ed. 529; New York v. Miln, 11 Pet. 102, 9 L. Ed. 648; Cummings v. Missouri, 4 Wall. 277, 18 L. Ed. 356. The area within, and under, the jurisdiction of a state may come under the exclusive jurisdiction of the United States by purchase by the federal government for a purpose prescribed by the federal constitution and with the consent of the state, or by cession of exclusive jurisdiction by the state to the United States. In either event, the land acquires a territorial status and ceases to be a part of the state, either territorially or jurisdictionally. Concessions Co. v. Morris, 109 Wash. 46, 186 P. 655. But, since self-preservation is the first law of nations and states, as well as of individuals, it will not be presumed, in the absence of clearly expressed intent, that the state has relinquished its sovereignty. Willis v. State, 3 Heisk. (50 Tenn.) 141; In re Kelly (C. C.), 71 F. 545; Ex parte Gaines, 56 Ark. 227, 19 S. W. 602; Barrett v. Palmer, 135 N. Y. 336, 31 N. E. 1017, 17 L. R. A. 720, 31 Am. St. Rep. 835.''

◼ No authority has been called to our attention to the effect that the state of Oregon has in any way relinquished its sovereignty over the area occupied by the waters of Bradford slough and that part of the north channel of the Columbia river which is within the territorial limits of the state. The whole contention of the plaintiffs seems to be based upon the well recognized rule that the federal government has exclusive power to regulate commerce, and that such power extends to the control of navigable waters of the country, to the lands beneath them, and to the erection of bridges, piers and all other instrumentalities of commerce which in the judgment of Congress may be necessary or expedient for the exercise of this power. Such paramount

authority, however, does not give to the federal government exclusive jurisdiction except in matters relating to the regulation of commerce and navigation, and the state is free to exercise exclusive legislative jurisdiction in all other matters within its territorial boundaries, except in such instances as it has in some manner relinquished jurisdiction.

■ It is therefore apparent that the state of Oregon has power to tax any personal property belonging to private individuals located on any of the navigable waters within the Bonneville dam project inside the exterior boundaries of the state. Likewise, any other power of taxation which the state has would be effective within that area.

The plaintiffs place much reliance upon the case of *United States v. Tucker*, 122 Fed. 518, in which it was held by the United States district court that a dam was a. "needful building" within the meaning of the provision of the national constitution hereinabove quoted. The question there involved was raised by demurrer to an indictment which charged the defendant with a crime committed on lands owned by the United States and known as lock No. 3 on Green river in the state of Kentucky. The court pointed out that the place where the criminal acts were alleged to have been committed "was on land then used for public purposes; that the state's interest in the land had been ceded to the United States by the legislature of Kentucky under an act approved February 20, 1886 (1 Sess. Acts 1885-1886, p. 11, c. 69); and that in addition to this the legislature of the state had, by the same enactment, in express terms, yielded to the United States jurisdiction over it". No such consent was given in the instant case or cession made by the state of Oregon of jurisdiction over the navigable waters involved in this litigation.

Most of the foregoing discussion has been limited to the area not purchased by the federal government. In that area, however, the main structural part of the works is to be located. Even assuming that the construction in the Bonneville dam project may be classified as a "needful building," nevertheless only a small part of it is located on lands purchased by the federal government.

To erect and maintain a structure such as the Bonneville dam, the declared purpose of which is to develop hydroelectric power and to aid navigation, does not necessitate the United States government's having exclusive jurisdiction over the site of construction. Such a project differs materially from "forts, magazines, arsenals" and similar structures, which by their very nature demand that the federal government have exclusive jurisdiction over them.

■ It has already been pointed out that the federal government may acquire by purchase, condemnation or otherwise, lands within the state, without the consent of the state, for governmental purposes, and that in many instances the federal government does not desire to exercise exclusive jurisdiction over the lands so acquired. The mere fact that there may be on the statute books of the state a general law, such as § 60-1303, Oregon Code 1930, consenting to the purchase of land by the United States and granting to the national government the right to exercise exclusive jurisdiction thereover, does not imply that over all lands purchased by the national government in the state after the enactment of such law the state is divested *ipso facto* of sovereignty, and exclusive control over the acquired area is assumed by the federal government. In the instant case there is nothing to indicate that the federal government desires to exercise exclusive legislative

jurisdiction over the land purchased by it within the Bonneville project. It would be somewhat inconsistent to assume that since it does not have such jurisdiction over the major part of the structures which are now being built, the federal government is seeking to exercise exclusive jurisdiction over that part of the works located on lands title to which it has acquired.

The record discloses that the government officials in charge of the construction work required the contractors to come under the provisions of the workmen's compensation law of the state in which the work was to be performed. At the time the contract with the plaintiffs was entered into at least two states had held that their workmen's compensation laws were not effective on territory over which the federal government had exclusive jurisdiction: *Willis v. Oscar Daniels Co.*, 200 Mich. 19, 30 (166 N. W. 496); *Murray v. Joe Gerrick & Co.*, 172 Wash. 365 (20 P. (2d) 591). On February 5, 1934, the supreme court of the United States affirmed the latter case. See 291 U. S. 315 (78 L. Ed. 821, 54 S. Ct. 432, 92 A. L. R. 1259).

The contract between the plaintiffs and the federal government was dated February 6, 1934. In view of those decisions it is reasonable to assume that the officials in charge of construction of the Bonneville dam on behalf of the federal government understood that the land included in the project was not under the exclusive legislative jurisdiction of the United States. Otherwise they would not have required contractors to provide state workmen's compensation. In this connection, it was said in *Ryan v. State,* supra:

"On the other hand, if the state were excluded from all jurisdiction, the residents of the project would be without school facilities, police protection, and the right to vote, the workmen would be deprived of the benefit

of industrial insurance, and the rules for sanitation would be suspended; for, if the state be wholly without jurisdiction, then it must follow that the state may not extend its privileges to the residents of the project nor expend its money in their behalf. Opinion of Justices, 1 Metc. (42 Mass.) 580; In re Town of Highlands (Sup.) 22 N. Y. S. 137; Sinks v. Reese, 19 Ohio St. 306, 2 Am. Rep. 397; State ex rel. Lyle v. Willett, 117 Tenn. 334, 97 S. W. 299; Ft. Leavenworth R. Co. v. Lowe, 114 U. S. 525, 5 S. Ct. 995, 29 L. Ed. 264; Surplus Trading Co v. Cook, 281 U. S. 647, 50 S. Ct. 455, 74 L. Ed. 1091.''

■ We conclude that the federal government has not acquired, nor is it assuming, exclusive legislative jurisdiction over any of the area within the Bonneville project inside the territorial limits of the state of Oregon, and that the plaintiffs are amenable to the laws of this state relative to taxation on personal income earned within the state.

The case of *Winston Brothers Company v. State Tax Commission,* post p. 505 (62 P. (2d) 7), on which plaintiffs rely, was decided by this court on the same day that the opinion in this case was handed down. Rehearing of the case at bar has been had and further study has been given the subject. Regardless of the holding in the Winston case, the facts of which are somewhat different from those in the case at bar, we are of the opinion that we were in error in our former decision in this case. Moreover, petition has been filed in the supreme court of the United States for a writ of certiorari in the Winston case, and any error which may have been committed therein will undoubtedly be corrected by that court.

We find no error in the decree appealed from and the same is affirmed.

BEAN, C. J., and CAMPBELL and KELLY, JJ., concur.

ROSSMAN, J. (specially concurring). Before work was begun upon the Bonneville dam both the state and the national governments possessed jurisdiction over the place where the work is now in progress. The state owned the bed of the stream and the fish in the water. If there was mineral or oil in the soil under the water that, too, belonged to the state. But the federal government had the right to regulate navigation upon the water. In exercising that right it could place a buoy in the water or build any structure that would aid navigation as, for instance, a dike, jetty, dam, etc. It was unnecessary to obtain a permit from the state to do so or to acquire title to the bed of the stream because the state's title was subject to the uses of navigation. In like manner it is unnecessary for a city to acquire a property owner's consent before it paves a street adjacent to his property or erects in it any structure which aids traffic. The erection of a structure in aid of navigation, in my opinion, does not deprive the state of its title to the bed of the stream. Should the structure later be removed the state's right to exclusive possession would be reinstated. In the meantime, both the state and the federal governments can continue to exercise their respective jurisdictions and rights. The Bonneville dam was erected for the same purposes, so we are required to believe, as a dike, jetty or other instrumentality placed in the stream to aid navigation. Had its purposes been foreign to navigation a different problem would be before us, for the government has no right to build nonnavigation structures in the beds of streams. There is no reason to believe that the federal government needs exclusive jurisdiction at this place in order to exercise its duty of aiding navigation, and, since exclusive jurisdiction has not been

expressly conferred upon it, I believe that the state retains the same jurisdiction as it had before the work was commenced. The magnitude of the undertakings at Bonneville and the fact that millions of dollars are being spent does not alter the situation. Had only a few pilings been driven into the bed of the stream, or had only a few tons of rock been dumped there so as to confine the flow of the water to a narrower channel, no one would claim that the government had acquired exclusive jurisdiction. I do not believe that the state has lost its jurisdiction. I concur in the result announced in the opinion written by Mr. Justice BAILEY, and state the above in amplification of the views there expressed.

———

BELT, J. (concurring in the result). This is a suit, brought under the declaratory judgment act, to determine whether the plaintiffs are subject to an income tax on profits earned in the performance of a contract with the federal government for construction work on the Bonneville dam project.

This federal project extends from the banks of the Columbia river in Washington to the banks of the river on the Oregon side near Bonneville. It also includes an extensive tract on the mainland in this state necessary to maintain and operate the locks and power house. It is conceded that the construction work of the plaintiffs was performed on the project within the territorial boundaries of Oregon, some of which was on the bed of the Columbia river.

On original hearing it was held—Justices BEAN and KELLY dissenting—that the federal government had exclusive jurisdiction over the territory within the dam

project area and that, by reason thereof, the State Tax Commission had no authority to impose the tax. The importance of the questions involved has prompted this court to again give careful consideration to the case.

At the very threshold of the case the court should not be unmindful of the well-established rule that the sovereignty of a state—which includes the power to tax—is not presumed to have been relinquished or surrendered. It is only when such intention is clearly expressed that a court should so declare: *Ryan v. State,* 188 Wash. 115 (61 P. (2d) 1276), citing numerous authorities. Also see 1 Cooley on Taxation, (4th Ed.) p. 159, § 60. If the contention of the appellants be sustained, the state is completely ousted from all jurisdiction over the area and, as stated by the Washington supreme court in the Ryan case:

"* * * the residents of the project would be without school facilities, police protection, and the right to vote, the workmen would be deprived of the benefit of industrial insurance, and the rules for sanitation would be suspended; for, if the state be wholly without jurisdiction, then it must follow that the state may not extend its privileges to the residents of the project nor expend its money in their behalf."

It is well established that, under and by virtue of Article I, § 8, of the constitution of the United States, the federal government has the power to acquire exclusive jurisdiction over territory within a state, if the land is purchased with the consent of the state for a constitutional purpose: *Surplus Trading Co. v. Cook,* 281 U. S. 647 (50 S. Ct. 455, 74 L. Ed. 1091) ; *Ft. Leavenworth R. Co. v. Lowe,* 114 U. S. 525 (5 S. Ct. 995, 29 L. Ed. 264).

Article I, § 8, of the federal constitution provides:

"Powers of congress—The congress shall have power—

"To regulate commerce with foreign nations, and among the several states and with the Indian tribes;

*   *   *   *   *

"To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and *other needful buildings;* * * *." (Italics ours.)

The three essential elements of the plaintiffs' case are: (1) Title to the land within the dam area project must be acquired by the United States government; (2) The consent of the state of Oregon must be obtained; (3) The land must be acquired for a constitutional purpose.

It is conceded that the federal government has acquired, by purchase or condemnation, title to the land within the dam area project, with the exception of title to the bed of the river. The State Tax Commission urges that the state has never been divested of title to the bed of this navigable river. Appellants contend that, with reference to lands underlying navigable waters of the state, the state merely holds the same in trust for the benefit of the public and that it was not necessary for the federal government to purchase land underlying the navigable waters of the Columbia river in order to have exclusive jurisdiction.

It is well established that, upon admission to the Union, this state became vested with title to lands under the navigable waters, subject, however, at all times to

the rights of navigation and fishery: *Cook v. Dabney,* 70 Or. 529, 139 P. 721. It is equally well-settled that, under the constitution, congress has the right to regulate commerce and navigation and that the exercise of such right is exclusive of state authority: *Stockton v. Baltimore & N. Y. R. Co.,* 32 F. 9; *Winston Bros. Co. v. State Tax Commission* (Or.), 62 P. (2d) 7, citing Gould on Waters (1883 Ed.) § 34.

The United States supreme court in *Illinois Central Railroad v. Illinois,* 146 U. S. 387 (36 L. Ed. 1018, 13 S. Ct. 110), in speaking of the nature of a state's title to land underlying navigable waters, said:

''The trust devolving upon the State for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. It is only by observing the distinction between a grant of such parcels for the improvement of the public interest, or which when occupied do not substantially impair the public interest in the lands and waters remaining, and a grant of the whole property in which the public is interested, that the language of the adjudged cases can be reconciled. *General language sometimes found in opinions of the courts, expressive of absolute ownership and control by the State of lands under navigable waters, irrespective of any trust as to their use and disposition, must be read and construed with reference to the special facts of the particular cases.* A grant of all the lands under the navigable waters of a State has never been adjudged to be within the legislative power; and any attempted grant of the kind would be held, if not absolutely void on its face, as subject to revocation. The State can no more abdicate its trust over property in which the whole people are

interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace.'' (Italics ours).

As stated in *Lewis Blue Point Oyster Co. v. Briggs,* 229 U. S. 82 (57 L. Ed. 1083, 33 S. Ct. 679, Ann. Cas. 1915 A, 232):

''If the public right of navigation is the dominant right and if, as must be the case, the title of the owner of the bed of navigable waters holds subject absolutely to the public right of navigation, this dominant right must include the right to use the bed of the water for every purpose which is in aid of navigation. This right to control, improve and regulate the navigation of such waters is one of the greatest of the powers delegated to the United States by the power to regulate commerce. Whatever power the several States had before the Union was formed, over the navigable waters within their several jurisdictions, has been delegated to the Congress, in which, therefore, is centered all of the governmental power over the subject, restricted only by such limitations as are found in other clauses of the Constitution.''

Also see *United States v. Chandler-Dunbar Co.,* 229 U. S. 53 (57 L. Ed. 1063, 33 S. Ct. 667), wherein the nature of the state's title to land underlying navigable waters is considered.

In *Stockton v. Baltimore & N. Y. R. Co.,* supra, Mr. Justice Bradley, speaking for the court on the question of the title or ownership of a state in lands under navigable waters, said:

''The power to regulate commerce is the basis of the power to regulate navigation, and navigable waters

and streams, and these are so completely subject to the control of congress, as subsidiary to commerce, that it has become usual to call the entire navigable waters of the country the navigable waters of the United States. *It matters little whether the United States has or has not the theoretical ownership and dominion in the waters, or the land under them; it has, what is more, the regulation and control of them for the purposes of commerce.* So wide and extensive is the operation of this power that no state can place any obstruction in or upon any navigable waters against the will of congress, and congress may summarily remove such obstructions at its pleasure. And all this power is derived from the power 'to regulate commerce.' " (Italics ours.)

Since the federal government had the right under the constitution to erect the dam across the Columbia river, without the consent of the state, it was not dependent upon the state for conveyance of title to the bed of the stream. Indeed, the technical title which the state held was subject to the paramount right of the federal government over commerce and navigation.

The land bordering on the river was acquired, with consent of the state, for the purpose of erecting a dam in aid of navigation and the development of hydro-electric power. When the federal government exercised control of the land in aid of navigation or commerce, the state was ipso facto ousted from all control thereover. Whatever title the state had in the bed of the river, as trustee, would not in itself preclude the federal government from exercising exclusive jurisdiction if the dam were erected for the primary purpose of aiding navigation.

To hold otherwise would be in direct conflict with *Winston Bros Co. v. State Tax Commission,* supra, a unanimous decision of this court (CAMPBELL, C. J., not participating) rendered on the same day that this case

was decided on original hearing. The Winston Bros. Co. case involved the right of the state to collect an income tax on profits earned in the performance of a contract with the federal government for the reconstruction and repair of the south jetty at the mouth of the Columbia river. The jetty extends ''on to certain tidelands and from thence over lands underlying navigable waters, and is some six or seven miles in length''. The court properly held that the government had exclusive jurisdiction and exempted the plaintiff contractor from payment of the tax. True, this court held that the title to the land underlying the navigable waters passed by virtue of § 60-1302, Oregon Code 1930, but upon further consideration it is believed that such section of the statute was not applicable and added nothing to the right of the government to obtain exclusive jurisdiction over the project. What was said in reference thereto was not necessary to a decision of the case. In the Winston case the state had expressly granted to the United States all its right, title, and interest ''in and to the land in front of Fort Stevens, and Point Adams * * * and subject to overflow, between high and low tide'' (over which the jetty extended). (Special Laws of Oregon, 1864, p. 72.) In 1913, the state also granted exclusive jurisdiction to the federal government over the land within the military reservation (Ch. 33, Laws of Oregon for 1913, now § 60-1305, Oregon Code 1930). The real basis of the decision in the Winston case was that this state had consented to the acquisition of land by the federal government for the sole constitutional purpose of building a jetty to aid commerce and navigation. Hence, the federal government had exclusive jurisdiction and the state had no authority to impose the tax.

The vital question in the instant case does not so much concern the title of the federal government to the land within the dam area project, but is rather whether such land was acquired by the federal government with the consent of the state for a constitutional purpose. If it was not so acquired, of course, exclusive jurisdiction does not rest in the federal government. The United States government may acquire land within a state by various methods, but to obtain exclusive jurisdiction over the same it must acquire ownership thereof, with the consent of the state, for a purpose within the contemplation of Article I, § 8, of the federal constitution.

The state, by a general statute enacted in 1909, codified as § 60-1303, Oregon Code 1930, thus gave its consent to the acquisition of land by the United States government:

"Consent is hereby given to the United States to purchase or otherwise acquire any lands within the state of Oregon for the purpose of erecting thereon *any needful public buildings,* under authority of any act of congress; and the United States may enter upon and occupy any such lands which may be purchased or otherwise acquired, and shall have the right of exclusive jurisdiction over the same; provided, that all process, civil or criminal, issuing under authority of the laws of the state of Oregon, may be executed by the proper officers thereof upon any person or persons amenable to the same within the limits of the land so acquired, in like manner and to the same effect as if this act had not been passed." [Italics ours.]

In the enactment of the above statute, the legislature undoubtedly had in mind the need of cooperating with the federal government in the acquisition of land within a state for a constitutional purpose as designated in Article I, § 8, of the federal constitution.

The erection of the dam in the instant case manifestly does not come within the descriptive terms of "forts, magazines, arsenals, dockyards" mentioned in the above constitutional provision. If the construction work comes under such constitutional provision, it must be within the term "other needful buildings".

As stated in *Ryan v. State,* 188 Wash. 115 (61 P. (2d) 1276):

"If the case were one of first impression, the rule of ejusdem generis would, in our opinion, exclude such work from the classification of 'needful buildings' because the particular work was in no way connected with, or related to, forts, magazines, arsenals, or dockyards."

However, the courts have given a broad interpretation to the term "needful buildings". It has been applied in the following cases, as cited in the Ryan case:

"A navy yard (Western Union Tel. Co. v. Chiles, 214 U. S. 274, 29 S. Ct. 613, 53 L. Ed. 994); a military hospital (Arlington Hotel Co. v. Fant, 278 U. S. 439, 49 S. Ct. 227, 73 L. Ed. 447); a military reservation (United States v. Unzeuta, 281 U. S. 138, 50 S. Ct. 284, 74 L. Ed. 761); an army training and mobilization station (Surplus Trading Co. v. Cook, 281 U. S. 647, 50 S. Ct. 455, 74 L. Ed. 1091); a customs house (Sharon v. Hill (C. C.), 24 F. 726); *locks and dams* (United States v. Tucker (D. C.), 122 F. 518); a post office (United States v. Andem (D. C.), 158 F. 996); a penitentiary (Steele v. Halligan (D. C.), 229 F. 1011); an Indian training school (United States v. Wurtzbarger (D. C.), 276 F. 753); a military cemetery (Wills v. State, 3 Heisk. (50 Tenn.) 141); a soldiers' home (Sinks v. Reese, 19 Ohio St. 306, 2 Am. Rep. 397); a courthouse (State v. Mack, 23 Nev. 359, 47 P. 763, 62 Am. St. Rep. 811.)"

Is the dam at Bonneville being constructed for a constitutional purpose? If it is not, exclusive jurisdiction in the federal government does not obtain even

though title to the land has been acquired. The principal objective of the government is undoubtedly the development of hydroelectric power. The fact that the dam aids navigation is merely incidental. Where the main objective is not a constitutional purpose—such as the development of hydroelectric power—the state has not surrendered its political sovereignty over the territory within the project, although the federal government has exclusive authority over the actual construction of the dam. The state, by its legislative enactment in 1909, only gave its consent to transfer exclusive jurisdiction in the event the land was acquired for a primary purpose within the contemplation of the constitution.

*Ryan v. State,* supra, a case involving the right of the state of Washington to exact an occupation tax from a contractor for services rendered to the federal government in the construction work on the Coulee dam project, is a recent expression of the supreme court of Washington. The decision of the case hinged upon whether the federal government had exclusive jurisdiction over the territory within the project. The objectives of the government in building and constructing the dam were (1) to promote navigation; (2) to develop hydroelectric power; and (3) to provide water for irrigation. The court held that the federal government had acquired title to the land within the Columbia Basin project but that the state had not surrendered its sovereignty and had the right to impose the tax. It was further held that a dam came within the terms of the constitutional provision, viz, "other needful buildings". It nevertheless said that:

"* * * irrigation, flood control, and power development (except in so far as the latter two are intended to promote navigation or else some war measure or the national defense) * * * are not functions

enjoined upon the federal government by the Constitution, nor are they delegated to the United States by the Constitution, nor is it necessary that they be committed, for their operation, to the exclusive jurisdiction of the United States government.''

and that:

''Legislative power, with reference to such things, is reserved in the state.''

The reason for the ultimate conclusion that the contractor was not exempt from the tax was thus stated by the court:

''We conclude, therefore, that the purposes of the project taken as a whole, do not fall exclusively within any of the enumerated classes mentioned above, so as to give the United States exclusive jurisdiction over the lands, but, rather in a class where several purposes are so intermingled as to call for the exercise of jurisdiction by both the federal government and the state, according as their respective interests and duties require.''

It is significant that the court, in reaching its conclusion, attached no importance whatever to the question of title to the bed of the Columbia river. The basis of the Ryan decision is that the project included objectives power over which was reserved to the states and the mere fact that the dam also promoted navigation and commerce did not oust the state from jurisdiction so far as imposition of the tax was concerned.

In the light of that decision, it is apparent that a contractor doing work in the state of Washington on the Bonneville dam project would be obliged to pay a tax on services rendered under a contract with the federal government. It would be an anomalous situation, to say the least, if a contractor doing work on the same project in the state of Oregon were exempt from payment of the tax.

In the much-cited case of *United States v. Tucker,* 122 F. 518, the dam and locks were erected by the federal government on Green river for the sole and exclusive purpose of promoting navigation, the title to the land had been acquired by the government with the consent of the state of Kentucky. Hence, it was held that the United States had exclusive jurisdiction over the territory within the project. The distinction between that case and the one at bar—in which there has been a commingling of functions reserved to the state with one over which the federal government had exclusive authority—is obvious.

In view of the character of the project—the main object being to develop hydroelectric power, a right reserved to the states—it is not considered that the federal government ever intended to exercise complete and exclusive jurisdiction over the territory within the dam area. The power actually exercised over the project by the federal government does not so indicate: *Benson v. United States,* 146 U. S. 325 (36 L. Ed. 991, 13 S. Ct. 60). Neither is it thought that the record in its entirety discloses clear intention of the state to relinquish its sovereignty. Unless it is clear that the federal government has acquired exclusive jurisdiction, the court should, indeed, be reluctant so to declare. To hold that the state has been completely ousted of jurisdiction means that a sort of "No-man's Land" has been established and that no law, civil or criminal, of the state would have any force or effect therein.

The decree of the lower court sustaining the right of the state to impose the tax is affirmed.

———

RAND, J. (dissenting). If the law is correctly stated in the majority opinion, then it would be impossible for

the United States ever to acquire exclusive legislative jurisdiction over any lighthouse, jetty, dam or other instrumentality erected as an aid to navigation on lands underlying the navigable waters of the state. Such a doctrine is not compatible with the dignity or the sovereignty of the United States when acting within the scope of its governmental powers. It is directly contrary to the decision in *Winston Bros. v. State Tax Commission,* post p. 505 (62 P. (2d) 7), and it is not supported by any of the federal decisions cited and relied on in the majority opinion.

It is conceded in the majority opinion that the United States has jurisdiction exclusive of all state authority over the lands above the high-water mark of the Columbia river on which a part of the Bonneville dam is being constructed, but it is contended that it does not have such exclusive legislative jurisdiction over the remainder of the lands which underlie the navigable waters of the river. This contention is based wholly upon the fact that the United States has acquired the fee simple title to the lands lying above the high-water mark of the river on which a part of the dam is being constructed but not to the bed of the Columbia river over which the remainder of the dam is to rest.

Because of this difference in the quality of its ownership and of this supposed defect in the title to the lands on which the dam is being constructed, a majority of the court are of the opinion that the United States has less jurisdiction over one part of the dam than it has over the other, and this is the sole ground on which, as I understand, the majority opinion is based.

This contention wholly ignores the fact that the legislature of this state by House Joint Resolution No. 2

and Senate Joint Resolution No. 12, filed respectively in the office of the secretary of state on November 27, 1933, and December 12, 1933, not only consented to the construction of this dam but also urged that it be constructed. (See Or. L., 2d Special Session, 1933, pp. 263 and 265.) It also ignores the consent given by the legislature of this state in section 60-1303, Oregon Code 1930, which gives consent to the United States "to purchase or otherwise acquire any lands within the state of Oregon for the purpose of erecting thereon any needful public buildings", and authorizes the United States to "enter upon and occupy any such lands which may be purchased or otherwise acquired", and gives to the United States "the right of exclusive jurisdiction over the same", saving only the authority of the state to serve process thereon. This statute applies as much to lands under navigable waters as to those lying above the high-water mark of the shores and rivers of the state.

The Bonneville dam was constructed for two purposes—as an aid to navigation and for the generation of hydroelectric power. House Joint Resolution No. 2 contains the following recital:

"Resolved, That Oregon's delegation in congress be and is hereby requested to do all in its power to have the chief engineer of the U. S. army substitute locks adequate for ocean going vessels, for the small locks now proposed to be constructed at the Bonneville dam, and failing in this effort, that a suitable bill be prepared and introduced in congress at the earliest opportunity, requiring such change be made at this time etc."

Senate Joint Resolution No. 12 begins with the following clauses:

"Whereas the people of this state are particularly interested in the success of the Bonneville project; and
Whereas the success of the power feature of said

development will be governed largely by its output, and its absorption by industries and the public in general; and

Whereas it is important that the state lend its fullest cooperation to the federal government in providing a market for such power; and

Whereas there are further questions involved which call for state cooperation; therefore,

*Be It Resolved by the Senate of the State of Oregon, the House of Representatives jointly concurring:* etc.''

The reason which causes a difference to exist in the title of the United States to lands purchased by it and lying above the high-water mark of the Columbia river and those lying below the navigable water of the river and occupied by this dam is that when the United States disposed of the public lands which bordered on the Columbia river it conveyed only to the true meander line, that is to say, the high-water mark of the river. This line marked not only the boundary of the lands conveyed but it also marked the boundary of the lands which were subject to disposal by the United States. Consequently, when the United States acquired title to the lands needed for the construction of the dam, it could acquire a fee simple title only to such lands as it had previously conveyed. As to the lands lying below the high-water mark on the Oregon side of the Columbia river, the title to such lands passed to this state upon its admission into the Union, as did all other lands underlying the navigable waters within the territorial limits of the state. This title vested in the state, not in its proprietary capacity but as a trustee for the public. The state acquired no interest in these lands such as the rights of a proprietor and was under no duty or obligation in respect to them other than to pro-

tect the rights of the public for the purposes of navigation and fishing. The state could not dispose of them in any manner which might interfere with the rights of the public to use them for those purposes. The title of the state was also subject to the paramount right of Congress to appropriate any part of these navigable waters and lands underlying them for the purpose of constructing and maintaining any structure or other means of regulating navigation.

Under such circumstances, the distinction which exists in the title of the United States to the lands lying above the high-water mark of the river, which were purchased for the purpose of constructing the dam, and the lands underlying the navigable waters of the river, which had been appropriated for the same purpose, ought not to be held to deprive the United States of the same jurisdiction over the one that it has over the other.

That one of the purposes for the construction of this dam was to regulate commerce and navigation must be conceded for otherwise there could have been no reason for the construction of locks to permit the passage through the dam of ocean-going vessels and, that being one of the purposes for its construction, the fact that the dam was also constructed for the development of hydroelectric power does not detract from the powers of Congress to construct the dam for the purposes of regulating navigation on the Columbia river, particularly since, as shown, the legislature of this state, by a general statute and by the joint resolutions above referred to, has authorized the appropriation by the United States of so much of the bed of the river as was necessary for the construction of the dam.

In this connection, it must also be borne in mind that the consent of the state was not necessary for the exercise by Congress of any of the powers delegated to it by Article I, section 8, clause 17, of the federal constitution.

If, as the majority now hold, the United States has jurisdiction exclusive of all state authority over the lands covered by the dam lying above the high-water mark of the mainland as well as over the lands covered by the dam on Bradford island, and has concurrent jurisdiction only over the remainder of the dam, then obviously this conflict of authority, which will require the state to police a part of the dam and not permit it to police the remainder, will result in a needless confusion and uncertainty in respect to the powers of the state and of the United States.

The question involved here is a federal question and until decided by the supreme court of the United States, if taken there, the courts of this state should be as zealous in protecting the rights of the United States from encroachment by the state as they are in protecting the rights of the state itself.