Argued March 20, 1930; affirmed January 3, 1931

## STATE *v.* IMLAH ET AL.
### (294 P. 1046)

*I. H. Van Winkle,* Attorney General, for the state.
*Oscar Hayter,* of Dallas, for respondents.

RAND, J. This is a suit by the state to quiet title to what it claims is an island which has been formed by the current in the bed of the Willamette river. The Willamette river at that place is a navigable, fresh-water stream and the state claims title by virtue of its ownership and sovereignty over the beds of navigable streams within its borders. The defendants severally own the lands bordering on the west bank of the river directly opposite to the premises in controversy and claim the same as an accretion to their lands. From a decree holding that the same does constitute an accretion to defendants' land, the state has appealed.

It appears from the evidence that defendants are the several owners of all the lands bordering on the west bank of the Willamette river in the N½ of section 22, township 7 south, range 3 west, and that adjacent to said lands and between the present river bank on defendants' premises and the waters of the river is a strip of sand and gravel, containing about sixteen acres, which has been formed by water and slightly raised above the surface of the water when the river is at its mean low water level. It also appears that there is a slight depression between the premises in controversy and defendants' uplands, but the undisputed evidence shows that this depression, like the premises in controversy, is all uncovered when the waters of the river are at mean low water level. The evidence further shows, both upon the part of the state, as appears from plaintiff's exhibit "A", a map of the premises in controversy, and upon the part of the defendants, that the depression referred to is all within the boundaries of the lands owned by the defendants, and that, when the exterior boundaries of their lands are traced upon the ground, there is nothing between such boundaries

and the waters of the river except a flat level surface of sand and gravel. It also appears from the evidence that at higher stages of the water, the depression referred to will be first submerged, then the remainder of the premises in controversy, and when the water is of sufficient height in the river at times parts of defendants' uplands will also be submerged. Because of the fact that at certain stages of the river this slight depression is filled with water, when other parts of the property in controversy are uncovered, the state contends that the subject-matter of the suit is an island in the river and must be treated as such in determining its ownership.

It also appears from the evidence that between 1882 and 1886, a small surface of sand and gravel was raised above the water somewhere west of the center of the river and that at that time there were two navigable channels of the river, one to the east and the other to the west of said small island, and that said west channel continued to exist and be navigable during high water stages of the river until about 1908. There is no evidence in the record from which can be determined with any degree of certainty the location of this small island or of said west channel, although the state claims that the island first appeared somewhere near the northeast corner of the premises in dispute. The evidence shows that said west channel to which we have referred was about one hundred feet in width and that during the time of its existence, as testified to by one of the operators of river craft at that time, the banks of the island and the mainland were so pronounced that one could step from the boat either on to the mainland or on to the island.

The evidence shows that there has been, in recent years, much washing away of islands and bars in the river and of the banks on defendants' premises and, if it should be assumed from the evidence that the west channel referred to followed the course of the slight depression to which we have referred, then two facts are established by the evidence. First, the channel has entirely filled up and no longer exists and, second, the channel itself was on defendants' premises and above the meander line of the river which the evidence shows was established by the federal government at the time the public surveys were extended thereover and is wholly within the boundaries of the lands now owned by defendants. Hence, should it be first assumed that the west channel of the river was situated between a part of the premises in controversy and the present high river bank on defendants' premises, which banks, as we have stated, have been washed away in recent years, then the evidence shows that the lands thus lost by the defendants through the action of the water in washing away the banks of the river have been restored to them by the deposit of alluvion thereon by the current of the river, and what was once the bed of the stream has now become dry land during the low water stages of the river.

The evidence shows that the lands now severally owned by the defendants Imlah and Hodge are parts of the Donation Land Claim No. 67 patented February 9, 1866, to Jesse Harriott and wife, and that one of the boundaries of said donation land claim as patented was one of the meander lines of the river and that a considerable part of the area in controversy here lies on the upland side of said meander line. The lands jointly owned by defendants Albert and Wallace are a part of

Donation Land Claim No. 51 patented August 5, 1871, to James White and wife. One of the boundaries of said donation land claim, as patented, the evidence shows, was also one of the meander lines of the river. Plaintiff's exhibit "A" wholly fails to show the lands owned by the defendant Dibble and wife. They own fractional lot 8 of section 22. It contains twenty acres of land and is bounded by the north line of section 22, the river and one of the easterly lines of the Harriott Donation Land Claim. Plaintiff's exhibit "A" shows that if said lot 8 had been delineated thereon, it also would have included a part of the premises in controversy.

■ The state's principal contention is that the small island first appearing in 1882, or shortly thereafter, somewhere west of the center of the river continued to exist as an island and to become enlarged by the gradual and imperceptible deposit of sand and gravel upon its outer edges, thereby filling up the channel between it and the west bank and extending the island to the mainland, and that the alluvion thus deposited between the two constituted an accretion to the island and not to the mainland as contended for by the defendants and as held by the court below in the decree appealed from. If this contention is sustained by the evidence, the rule unquestionably is that where an island arises in a stream, the title to the bed of which is in the state, it does not belong to the owner of either shore. But if it is formed upon a portion of the bed which belongs to a riparian owner, it becomes his property. 1 Farnham on Water Rights, (1904 Ed.), p. 276, and authorities there cited. There was some evidence offered by the state tending to show that, after this small island was first raised above the surface of

the water, it gradually became extended to the south and west until it became connected with the mainland, but this testimony was offered by witnesses who were acquainted with the immediate premises only during the period of time when the west channel of the river was navigable and who renewed their acquaintance by an examination of it while in its present condition. As stated, the channel of the river at and immediately above that point has been the subject of continual change. There is no positive evidence from any witness by which the court can determine as a fact that any portion of the island, as it existed between 1882 and 1908, when the west channel became unnavigable, is a part of or connected with any of the premises in controversy. Nor is there any testimony tending to show with any degree of certainty that the small island, as originally formed near the center of the river in the early eighties, is now in any way connected with the west bank of the river. There is much testimony offered on behalf of the defendants tending to show that the west bank on defendants' lands has been eroded and washed away in places for a distance of at least three hundred feet, and that, by such erosion, the gravel which prior thereto underlaid the river bank has become exposed. Many witnesses, who lived in that vicinity and were thoroughly familiar with the west bank of the river at that point, testified that the west bank of the river extended for a considerable distance beyond the upland before reaching the water, and that there was but a narrow strip of water between said shore and the island.

This testimony leads to the conclusion that the accretions grew from the shore of the mainland and not from the island. This was the conclusion reached by

the learned trial court and we think it is sustained by the preponderance of the evidence. But, independently of this, there is another aspect of the case which we think leads to an affirmance of the decree. The evidence shows that the river at that point was meandered when the adjacent lands were surveyed and that the property was conveyed with reference to said meander lines. But since the state, upon its admission into the Union, by virtue of its sovereignty became the owner of the beds of all navigable rivers within its boundaries, it thereby acquired title to all the lands below the high water mark on each bank of the Willamette river, it being navigable at that point and there being no island there at that time. For that reason, the public lands conveyed with reference to the meander lines were bounded by the river and not by the meander lines. For, as held by this court in *Johnson v. Knott,* 13 Or. 308 (10 P. 418), the point to which the water usually rises in an ordinary season of high water is the true meander line and forms the boundary of the title of the United States. Again, in *Weiss v. Oregon Iron and Steel Co.,* 13 Or. 496 (11 P. 255), Justice LORD, speaking for the court, said:

"The law is now considered well settled that where a stream is meandered in the public surveys, the stream, and not the meander lines, is the true boundary of the riparian owner."

Again, by act of Congress the boundary of public lands granted by the United States bordering on navigable streams is the bank of the stream and not the thread: *St. Paul & P. Railroad Co. v. Schurmeier,* 7 Wall. 272 (19 L. Ed. 74) ; 3 Washburn on Real Property, (5th Ed.) p. 443. See also *Minto v. Delaney,* 7 Or. 337. The evidence wholly fails to show to what point the waters in the Willamette river were raised during ordi-

nary high water at the time sections 15 and 22 were surveyed and the meander lines established. In the absence of any proof to the contrary, we must assume that the meander lines as so established and marked upon the ground truly represented the point to which the waters of the river were raised during ordinary stages of high water at that time. But that question is not important because, subsequent to the time when the lands now owned by defendants were patented, by an act of the legislative assembly (Laws, 1872, p. 129, as amended by Laws, 1874, p. 76, and Laws, 1876, p. 69) the State of Oregon granted and confirmed to the owners of upland abutting on the Willamette river all the lands opposite such holdings between high and low water marks: *Pacific Elevator Co. v. Portland,* 65 Or. 349, (133 P. 72, 46 L. R. A. (N. S.) 363) ; *Richards v. Page Inv. Co.,* 112 Or. 507 (228 P. 937) ; *Lange v. St. Johns Lumber Co.,* 115 Or. 337 (237 P. 696) ; *Gatt v. Hurlburt,* 131 Or. 554 (284 P. 172).

■ Under said grant of the lands lying between the high and low water marks of the Willamette river by the state, defendants' lands, at all stages of the river, were in actual contact with the water and the owners thereof were riparian owners and became entitled to all the rights and privileges of such ownership. This included the right to all the accretions which thereafter should become annexed to the shore or river bank upon their respective premises. There is no evidence whatever by which the low water mark of the river at the time of said grant can be fixed. At present all the premises in controversy are attached to the shore or bank of the river and uncovered during mean low water. The state alleges ownership thereof and its claim of ownership was denied. The burden of proving the state's ownership rested upon the state. The

evidence offered by the state wholly fails to show the title in the state. The evidence shows that when the boundaries of the lands actually patented are traced upon the ground, the lands patented include much of the disputed territory and if it should be assumed, an assumption which would not be proper under the evidence in this case, that the low water mark was identical with the exterior boundaries of the patented lands, then the lands lying between such exterior lines and the low water mark of the river are all attached to the patented lands and constitute merely an accretion thereof.

Under these circumstances we think that the rule "once a riparian owner, always a riparian owner" should be applied. 1 Farnham on Waters and Water Rights, p. 326. As said by Mr. Justice McBride, speaking for this court in *Hanson v. Thornton,* 91 Or. 585, (179 P. 494):

" * * * One who purchases land abutting upon a lake or watercourse, usually considers his right of access to such waters as an element of value in the purchase. When we speak of riparian rights, we are not considering a mere shadowy privilege but a substantial property right, the right of access to and a usufruct in the water. To say that the owner of such a right may without his consent be deprived of it by the state or the general government permitting some other person to obtain title to the accretion formed by an impounding or diversion of part of the waters that previously washed the shore of his land, does not appeal to our sense of justice and we do not believe that the authorities generally support such a doctrine."

For the reasons stated, the decree of the lower court must be affirmed and it is so ordered.

BELT, BROWN and KELLY, JJ., did not participate in this case.