Argued May 31, affirmed August 29, petition for rehearing
denied September 26, 1950

# WALDOW *v.* WALDOW
## 221 P. (2d) 576

*Dan J. Kenney,* of Portland, argued the cause for appellant. With him on the brief was Elton Watkins, of Portland.

*Wesley A. Franklin,* of Portland, argued the cause for respondent. On the brief were Anderson & Franklin, of Portland.

Before LUSK, Chief Justice, and BRAND, BELT,* ROSSMAN and HAY, Justices.

BRAND, J.

The plaintiff, Melvin Waldow, brought suit for divorce against his wife, Harriett, alleging cruel and inhuman treatment, and seeking the custody of the infant child of the parties, who was then seven months of age. The defendant answered, charging the plaintiff with cruel and inhuman treatment and seeking a divorce, attorney's fees, suit money, custody of the child, permanent alimony, and support money for the child. After trial upon the merits a decree was entered awarding a divorce to the plaintiff, but awarding to the

* Died August 6, 1950.

defendant the temporary custody of the child, together with $50 a month for its support. The court also ordered the plaintiff to pay to the defendant forthwith the balance of the attorney's fee which had previously been allowed, in the sum of $200, $50 of which had been paid. The plaintiff appeals.

The order of events is important. The parties were married in November, 1945. The plaintiff was twenty-one years of age at that time and the defendant was fifteen. At the time of trial in May, 1948, plaintiff was twenty-four and defendant nearly eighteen, and their infant son, Lawrence, was not quite eleven months of age. Both parties were represented by competent counsel. At the close of the presentation of evidence, the following transpired:

"MR. JACK: That is our case, Your Honor.
"THE COURT: Does defense have rebuttal?
"MR. FRANKLIN: No, Your Honor; that is all.
"THE COURT: Both sides have finished their case?
"MR. JACK: That is right.
"MR. FRANKLIN: Yes, Your Honor."

Thereupon the court verbally announced that the decision would not be rendered for ninety days, and expressed the hope that a reconciliation might be had. In its closing remarks the court said:

"* * * This child should grow up to love and respect both parents. I feel satisfied that the parents on both sides will make every effort to effect a reconciliation. * * *"

Concerning the custody of the child the court said:

"* * * Now during that time the child must be cared for, and it seems to me that the defendant does not have a place to maintain the child. So

until this thing is finally decided, I am going to leave the child where it is * * *".

The verbal order of 3 May 1948 was confirmed by a nunc pro tunc order of 22 July 1948 entered as of 3 May, the date of the trial. The decree of divorce was signed on 24 December 1948 and entered on the 27th of that month.

■ Three days after the entry of the decree, the plaintiff, by attorneys other than those who had represented him at the trial, moved for an order setting aside the decree and granting a new trial to enable the plaintiff to present evidence relative to the custody of the child, and concerning events alleged to have occurred after the end of the trial, but before the date of the decree. Numerous affidavits were presented in support of and in opposition to, the motion. The affidavit of the plaintiff reads in part as follows:

"I, MELVIN WALDOW, being first duly sworn, upon my oath, depose and say: That I am the plaintiff herein; that the notice of the decree herein came to my attention Monday, December 27th, 1948; that I had understood that when the last hearing was had on May 4th, 1948, that there would be another hearing before the final decree was entered and that I have been ready with my witnesses to present additional testimony ever since that date which goes to the conduct of the defendant since that date as well as to the welfare of the baby since that date * * *".

A large part of the evidentiary matter which was submitted by affidavit relative to the motion for a new trial, relates to the fitness of the defendant as prospective custodian of her infant child, the identical issue which was litigated at the trial. Most of the matters contained in the affidavits could have been presented

at the trial, and some of them are clearly repetitious. A few incidents related in the affidavits, occurred after the trial had ended, but before the decree had been entered. One incident is alleged to have occurred in Tacoma in July, 1948. The mother had apparently taken the child to her relatives in Tacoma without the permission of the Oregon court and the plaintiff, accompanied by his mother, Mrs. Herman Waldow, Mrs. Minnie James, and two deputy sheriffs, went to the home of the defendant's mother and demanded the child. The affidavit of Mrs. James states that the child was in deplorable condition, and that the defendant, the mother of the child, at that time said, "I am making a man out of Larry; he is drinking whiskey and beer". The affidavit of the defendant is a categorical denial of the charges. The trial court considered all of the affidavits seeking a new trial and denied the plaintiff's motion. If the matter were before us, which it is not, we could not say that the court abused its discretion in so acting. In *Mannix v. Harju et al.*, 125 Or. 258, 266 P. 238, this court said:

"There is no statute which authorizes the relief of a new trial in an equity suit. The statute authorizing the granting of a new trial applies only to law actions and has no application to a suit in equity. See In re Seidel's Estate, 64 Or. 321, 324 (130 Pac. 53), and Lachele v. Oregon Realty Exchange Inv. Co., 121 Or. 582, 587 (256 Pac. 646). * * *"

■ At the time the motion for new trial was made, the court had already heard and considered all of the testimony offered at the trial. The parties had rested; the case was closed, and the matters contained in the affidavits were largely cumulative. True, the court,

during the term in which the decree was rendered, could have set it aside, which would have:

> "* * * left the case as it was before the entry of a decree and restored in the court its power to enter a proper decree or do any other act which the court could lawfully have done before the entry of the vacated decree." *Mannix v. Harju,* 125 Or. 258, 266 P. 238.

But, this is not a case involving the presentation of evidence as to matters occurring after the decree and showing a change of circumstance, nor does the plaintiff claim that the evidence presented by affidavit three days after entry of the decree was not known to him in ample time for presentation to the court before the decree was entered. In fact, the affidavits filed by the plaintiff conclusively establish that he could have presented the evidence contained therein before the decree was entered. It will be recalled that the plaintiff swore on 30 December 1948 that he had been ready with his witnesses to present additional testimony ever since the 4th day of May when the trial was ended.

■ ■ This is not a technical matter. The enforcement of just rules governing orderly procedure is of the essence, and the disregard of such rules by counsel or court imperils due process itself. It is always possible for a litigant acting in good faith and having important evidence which has not been presented to the court, to move to reopen the case for further testimony at any time prior to the signing of the decree, and the court has power in its discretion to allow such a motion. But to allow a party to withhold evidence and gamble on a favorable decision of the court, and then when a final decree, unsatisfactory to him, has been

entered, to move for a new trial or for a vacation of the decree in order to do what he could, and should have done earlier, would be to open the door to delay, confusion, and at times to the tactics of the pettifogger. If the trial court were to permit such tactics, the result would be the disruption of rules of procedure which have been honored for generations. We have discussed the point because of its importance in the practice, but we do not mean to hold that the affidavits filed in this case were such as would have required the trial court to reopen the case, even if a motion to take further testimony had been made before the decree was entered. The short answer to the plaintiff's contention on the motion for new trial is that the affidavits contain nothing that occurred since the decree. The denial of the motion for a new trial would not have been an appealable order, even if made in an action at law under the provisions of statute. O. C. L. A., §§ 5-801 and 5-802. Even in an action at law where the statute authorizes motions for new trial, the denial of such a motion not based on anything occurring after the judgment, presents nothing for the consideration of this court. See *Parmentier v. Ransom et al.,* 179 Or. 17, 169 P. 2d 883. The rule applies with greater force in an equity suit in which motions for new trial are not authorized. The case must be decided on the record which was made at the trial, on the basis of which the decree was made, from which alone the plaintiff has appealed.

Neither party is contesting that portion of the decree which divorced the parties. As stated in plaintiff's brief, the sole question for this court to determine is what is best for the infant son. The law relative to that question is so well settled that it would be useless to repeat it here. Our only duty is to apply to the

facts the recognized principles which guide, but do not wholly control, the discretion of the trial judge. If the question were before us, we would have great difficulty in deciding whether either party was entitled to a divorce, and if so, then to whom it should have been granted. Much of the evidence which was directed to this issue also has a bearing upon the question of custody.

This is a case of a farmer boy who fell in love with and married a fifteen-year-old child. An infant son arrived in due course. The infant bride was taken to the farm home of the parents of the groom, and there she remained, to the accompaniment of protestations by the plaintiff of intention to provide a separate home, and protests by the defendant against her satellite status in the home of her in-laws. One feature of the plaintiff's case deserves notice. Substantially all of the testimony offered by the plaintiff and his witnesses relative to trouble between himself and defendant, is limited to the period beginning on 24 December 1947 and ending on 13 January 1948, and within that short period there was an interim of fourteen days during which the defendant was in Tacoma with her relatives. She left the plaintiff on 29 December 1947 and returned from Tacoma on 11 January 1948. On 12 January she made arrangements with the plaintiff to get her possessions. On 13 January she came to the home of the plaintiff and his parents to secure them, and on that same day the plaintiff filed suit for divorce. The plaintiff stoutly and repeatedly testified that all relations between himself and his wife were harmonious and satisfactory until Christmas Eve, 1947.

"Q. Now, these times she left you are referring to, this last Christmas and Thanksgiving, you folks

weren't getting along too good about that time, were you? A. We were getting along fine.

"Q. You were getting along fine, no arguments or quarreling? A. No argument, no nothing."

Again he testified, "we got along fine up until, I think it was Christmas Eve". The picture presented by the plaintiff and by his parents is that of a happy group living together until Christmas when the defendant went to her mother's home where she remained until Saturday night, December 27th. On that night plaintiff testified, "she come home and fight with me." The plaintiff's mother, a strong witness for her son, testified that there was no trouble, either between herself and the defendant or between the plaintiff and the defendant, until the trip of 29 December 1947. It seems highly improbable that the relationship of the defendant to her mother-in-law and to her husband, should have been so perfectly harmonious up to a specific date and then should have developed an irreparable breach almost over night.

The testimony of the defendant reflects a very different situation. Hers is the story of deferred hope for a home; domination and criticism by the plaintiff's parents; bickering by the husband and wife, and restlessness of a girl too soon married, and too young for motherhood. The plaintiff received from his father for working on the farm $100 a month, plus board and room for himself, wife and baby. He refused an offered job which would have paid him $75 per week, preferring to stay at home. According to the testimony of the defendant, her husband promised her a separate home. He was jealous. He falsely accused her of illicit relations with other men and told her the marriage was a mistake. There is evidence which satisfies us

that on at least two occasions plaintiff was guilty of physical violence toward his wife. She testified:

"A. Well, he wanted me to have perverted relationship, and I told him no, and that is what mostly all of our arguments were caused over, and I told him I couldn't put up with it any longer than that, I was going to get a divorce.

"Q. How often would he ask you to enter into these unnatural sexual relationships? A. Just about all the time.

"Q. Did you have any violent arguments about it? A. Yes, sir.

"Q. Did he ever beat you about it? A. Yes, sir, but not where his folks could see."

The defendant also testified that when she became pregnant her husband wanted her "to get an abortion". Each testified that the other showed no love for the baby or for the other party to the marriage. There was a little testimony concerning an instance or two of drinking intoxicating liquor by each party. All of these charges and countercharges were expressly denied. The plaintiff testified that the defendant never told him she was unhappy while living with his parents; never asked him to get a separate home; never asked him to get an independent job. He testified that all the defendant did was a little house work. Yet, the plaintiff, his father, Herman Waldow and his mother Pearl Waldow, told of long conversations about the proposed building of a separate home for the young folks and the plaintiff himself testified that when the defendant told him that she no longer loved him and was going to leave, he said: "I told her if she wanted a home I would buy her a home or move someplace else, if that is what she wanted to do, and she said no." The evidence which we have reviewed is indirectly pertinent

to the question of custody. It shows animus, bias and gross exaggeration on both sides and particularly on the side of the husband. We therefore look with some skepticism upon the evidence adduced by the plaintiff as to the way in which the youthful mother cared for her child. It should be said first that there is no evidence offered of immoral conduct on the part of the defendant. The plaintiff denies that he ever accused her of such conduct. Notwithstanding the repeated testimony that conditions were satisfactory until Christmas of 1947, there was also much testimony to the effect that after the baby was born the defendant started leaving home. Plaintiff testified, "Well, she would leave home about every other day, go into Portland with the little baby." He also testified:

"A. Oh, she was gone all the time.

"Q. She was gone all the time? A. Yes,—well, there were certain days she would stay home, but not to put the meal on the table. There was a few times she did."

Plaintiff's mother testified concerning the defendant that:

"A. * * * she has never stayed home to take care of it. She was always gone. The night she even left for Tacoma the baby was sick.

"Q. Did you tell her the baby was sick? A. Yes, I told her. She knew the baby was sick.

"Q. What interest did she have in caring for the baby when it was sick? A. None."

However, she also testified as follows:

"A. Well, we worked together. She helped me cook, and we set the table together and we done our work together.

"Q. Was that apparently a pleasant and companionable arrangement? A. It was, yes."

Plaintiff's mother also testified that she herself was gone from the farm once or twice a week. The plaintiff's father testified that the defendant:

"A. * * * washed the dishes and took care of her bedroom and some of the other rooms, and washed her clothes and my wife washed my clothes and her clothes, and my wife washed all the towels and stuff like that. The only thing Harriett washed was, you know, Melvin's clothes and her clothes, and as far as any of the towels and bath towels and dish towels and all that stuff, the wife took care of all that. * * *"

There is no evidence whatever of any occasion when the defendant left home, either with or without the infant, for any purpose other than that of visiting with her own mother or sisters, some of whom lived within ten miles of the plaintiff's home. Plaintiff's father testified that some of the defendant's sisters called upon the defendant for assistance "for one thing and another". The defendant's father had been bedridden and died in October of 1947, which, we think may explain some of the defendant's visits to her mother and sisters after that date.

The testimony concerning the care given to the child is about evenly divided. The plaintiff and his relatives testified that the child was not kept clean; was once without a bath for ten days, and that the infant's bed was not kept in suitable condition. The defendant, her mother Mrs. Davidson, and her two sisters, Mrs. Dominic Roberti and Mrs. Hynes, all testified that the defendant gave to the child the best of care, with plenty of baths and clean clothes. The defendant explained the alleged absence of baths by saying that when the child had a cold she only sponged him. We are not competent to pass upon the competitive merits of the two forms of ablution.

The plaintiff places emphasis on certain evidence which was offered to prove that the defendant did not care for the child or desire its custody. The statement of the defendant to that effect, if made at all, was in the heat of the discussions which preceded the final separation. The defendant denies that she made any such statement. On 12 January 1948, immediately following the defendant's return from fourteen days spent in Tacoma, the plaintiff, accompanied by the minister of the church to which the defendant belonged, went to see the defendant. Concerning the interview, plaintiff testified:

"Q. And when you took him over there what was said,—were just the three of you present? A. Yes.

"Q. What was said? A. I told her if she wanted a home I would buy her a home or move someplace else, if that is what she wanted to do, and she said no.

"Q. Did she say why she wouldn't come back? A. No, the only thing she said, that she didn't love me any more, and I could take the baby, she didn't want the baby at all."

Reverend E. G. Wuest who was present at the interview testified, but made no mention of any such statement by the defendant. Upon cross-examination the plaintiff testified as follows:

"Q. Now, you testified that she told you she didn't want the baby. Who was there when she made that statement? A. Well, I think that time we was all by ourselves.

"Q. Beg pardon? A. The only time she told me when she wanted the baby was that night when she was going to leave.

"Q. No, answer my question. You testified that you and the minister went over to see Mrs. Waldow. A. Yes.

"Q. And she told you she didn't want the baby? A. No, at that time she didn't say anything about the baby.   *   *   *"

On 13 January, by prearrangement, the defendant went to the home of the plaintiff and his parents for her belongings. When she attempted to take the baby's birth certificate a physical altercation took place, resulting in charges being filed against the plaintiff, which, however, were dismissed. Defendant testified that the plaintiff slapped and choked her and did not let her take the child, and that the sheriff "came out and says I couldn't take him without a court order." On cross-examination the plaintiff testified:

"Q. Well, now, this altercation that took place out to your ranch, that was because she came out and wanted to take the baby; isn't that what it was about? A. Yes—oh, no, no; no, absolutely not.

"Q. What was her purpose out there, do you know? A. To get all of her clothes.

"Q. Just to come out and make some trouble with you? A. That was it.

"Q. Didn't she ask you to take the baby with her that day? A. She didn't pay any attention to the baby until she got ready and all the clothes packed. For about forty-five minutes she never paid no attention to it, not until she got ready to go.

"Q. Didn't you slap her around a little bit on that day? A. I absolutely didn't.

"Q. You refused to let her take the youngster? A. I did."

The record shows that the plaintiff has not complied with the court's order to pay attorney's fees; that he has not supported the defendant since she left on 13 January 1948; that she has no income of her own; has never earned a living, and has been dependent on

the help of her mother and sisters. The decree of divorce gave to the defendant temporary custody of the child, subject to full supervision of the juvenile officer of Clackamas County, Oregon. She has not had the child, nor has plaintiff paid her any support money. At the close of the testimony on 3 May 1948, the court refused to award to the defendant any support money, even pending entry of the decree, although advised that the defendant, then seventeen years of age, was without funds. Despite all this, the defendant has continued to this date her battle for the custody of the infant. We think her conduct indicates more clearly than any words, the existence of her mother instincts and her desire for custody of the child. Defendant is living with a married sister who is willing to accommodate mother and child in the home.

■■ This is a typical case of conflicting testimony at nearly every point. We cannot, like Solomon, threaten to give one-half of the child to each claimant and then observe the result. I Kings, 3:25. The child must be delivered in one piece to one claimant, and the decision is always based on calculated risk and probability, not certainty. The rule generally followed has been to entrust to the mother the care of children of such tender years, unless she is found to be morally unfit. The trial court had a far better opportunity than has this court to accurately appraise the situation. It concluded, in a very close case, to entrust the child to its mother. We approve that decision.

■ Much is made of the orders which gave to the father temporary custody pending the trial. Those orders were not based upon the merits. The defendant is entitled to have the decree of the circuit court enforced forthwith and in full, including any unpaid balance of

attorney's fees as may appear from the records of the County Clerk of Clackamas County. Defendant has applied for an additional allowance of $750 to cover fees for services in this court. She should now be allowed an additional sum, and being of the opinion that $100 is a reasonable amount to be paid for that purpose, the decree will include that sum in addition to any unpaid balance of the fee awarded in the circuit court. *O'Brien v. O'Brien,* 36 Or. 92, 57 P. 374, 58 P. 892; *Thomsen v. Thomsen,* 128 Or. 622, 275 P. 673. Under the supervision of the juvenile officer, the continuing welfare of the child will be a matter of official observation. The circuit court retains jurisdiction to act if, after enforcement of the decree there should be a material change of conditions to the detriment of the child.

The decree is affirmed and the defendant will recover costs.

PETITION FOR REHEARING

*Elton Watkins* and *Dan J. Kenny,* of Portland, for the petition.

*Anderson & Franklin,* of Portland, contra.

Before LUSK, Chief Justice, and BRAND, BELT*, ROSSMAN and HAY, Justices.

Petition denied.

BRAND, J.

The appellant seeks a rehearing and in support thereof says:

"Appellant respectfully contends that error was made in the following language (Opinion p. 11) 'The defendant is entitled to have the decree of the cir-

---

\* Died August 6, 1950.

cuit court enforced forthwith and in full,' — —· — and — ·— — 'The circuit court retains jurisdiction to. act *if, after enforcement of the. decree* there should be a material change of conditions to the detriment of the child'.''

Our intention was to make it clear that the decree of the circuit court was to be carried out forthwith and without any intervening litigation. The decree which we affirmed speaks as of its date. and determines the right of custody as of that date. The circuit court retains jurisdiction as in other cases, to consider applications based on alleged change of conditions material to the welfare of the child and subsequent to the decree. It was not the intention of this court to impose any different or unusual limitation upon that jurisdiction. The other assignments of error have been considered and are without merit. The petition is denied.