Argued January 8, affirmed May 28, 1958

# FREYTAG *v.* VITAS

326 P. 2d 110

*John C. Caldwell,* Oregon City, argued the cause for appellants. On the briefs were Beattie, Hibbard & Caldwell, Oregon City, George D. LaRoche and White, Sutherland and Parks, Portland.

*Lloyd G. Hammel,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief was Robert Y. Thornton, Attorney General, Salem.

Before PERRY, Chief Justice, and LUSK, WARNER and KESTER*, Justices.

WARNER, J.

This is a suit to quiet title to a gravel bar in the Willamette River, a navigable stream, commonly known as "Meldrum Bar." From a decree holding title to be in defendant State of Oregon, the plaintiffs, the intervenor, Mitchell, and all other defendants, except Jack Houston and Leona Vinson, appeal. We will hereinafter refer to the plaintiffs appellant as the "upland owners."

Because of the conclusion we reach in this matter, it is unnecessary for us to comment upon the respective claims of title made by the parties other than those of the state and the upland owners.

---

* Resigned March 1, 1958.

Meldrum Bar is a large gravel bar of about twenty-five acres in area, lying on the east side of the Willamette River, approximately a mile below Oregon City and only a short distance north of where the Clackamas River flows into the Willamette. It is roughly oval in shape and presently connected to the east bank or upland when the river is at the average low water mark. Between the downstream or northerly end of the bar and the upland there is a slough, known as Meldrum Slough. Leading from the upstream or southerly end of said slough is a depression through which water flows during average high water, that is, it flows from the southerly end of the bar downstream to the northerly end and toward Meldrum Slough. Thus, in high water the bar becomes an island.

This depression, referred to by some witnesses as the old channel, or east channel, follows substantially the base of a fairly precipitous bank which approximates the meander line of the upland property and which meander line is the western boundary of the land patented to the Rinearsons, the original patentees. That part of the upland bank which is nearest the upper or southerly end of the bar, has, however, been worn back in a considerable amount for a short distance along the original meander line and, therefore, at that point would not conform exactly to the original meander lines as established by the patent to the upland. From this depression or old channel, the bar slopes upward in a westerly direction toward the Willamette River. The highest point in the bar is on the downstream, outside portion where cottonwood trees of considerable size are to be found. Except for the soil around the base of these trees, the rest of the bar is composed of sand and gravel upon which willows and other brush grow.

It is the state's position that prior to 1878 the property in controversy was an island. The upland owners contend that the bar has always been a part of the upland since early explorations.

The only question for resolution presented by this appeal is: whether or not the land involved was a bar or island at low water during the period from 1874 to 1878.

The upland owners claim title to Meldrum Bar as the sole heirs of the residuary devisees and legatees of Peter M. Rinearson and his wife, who, in 1863, were the original patentees of a Donation Land Claim of 640 acres, more or less, from the United States. Their title included at that time all the land above the high water mark which was adjacent to the bar.

The state of Oregon from and after February 14, 1859, when it was admitted as a state, became the owner of the river bed and all islands situated therein, lying between the high water marks of the banks of the river.

The legislature in 1874 relinquished the state's title to all lands on the Willamette River lying between the high and low water marks to the adjacent or upland owners of that time (Laws of 1874, p 76, approved October 26, 1874). The Act of 1874 was repealed in 1878 (Laws of 1878, pp 54-55, approved October 18, 1878).

It follows, therefore, that if the position of the state is correct, that is, that the controverted property was an island in 1878 at ordinary low water, its title to the island remained unimpaired by the Act of 1874. To the contrary, if appellants' proof disclosed that the parcel in question was not such an island in 1874, or became attached to the mainland during the period

from 1874 to October 18, 1878, then the state now has no title in the same.

■ The essence of the upland owners' first two propositions is: that the only logical conclusion warranted by the evidence is, that the land in question was a bar attached to the upland during the crucial period from 1874 to 1878.

In a suit to quiet title to real property, the plaintiff must recover on the strength of his own title and not on the weakness of his adversary's title. The burden is on plaintiff to establish that he has a perfect legal or equitable title, regardless of the status of defendant's title. As a result, when the pleadings place the title in issue, plaintiff has the burden of showing that the title claimed by him is superior to that of defendant. *Murphy v. Bjelik,* 87 Or 329, 345, 169 P 520, 170 P 723. But when each party claims to be the owner, the burden is upon each adverse claimant to make good his affirmative averments by evidence touching his own title to the property. *Durkin v. Ward,* 66 Or 335, 338, 133 P 345; *State v. Imlah,* 135 Or 66, 73, 294 P 1046.

The state's claim of title rests primarily upon the 1852 map it introduced. This map was prepared in the office of the Surveyor General on June 30, 1852, and is certified by that official as being "strictly conformable to the field notes of the survey thereof" and shows the contested area to be an island in the Willamette River as of that date. Surveyor's notes, made in 1851, were also introduced in evidence and speak of the "island overflowed at high water." The appellants offered no evidence impeaching the credibility of this map and we are not impressed by the argument which they make in an attempt to cast doubt on its validity.

Thus is brought into play as an applicable presumption, ORS 41.360(32), which provides that: "A thing once proved to exist continues as long as is usual with things of that nature."

A presumption, by the language of ORS 41.310, is a species of indirect evidence, and while not evidence in the strict sense of the term, this court has held, it "stands in lieu of evidence" until overcome by evidence to the contrary. *Wyckoff v. Mutual Life Insurance Co. of New York,* 173 Or 592, 598, 147 P2d 227. The rule established in the Wyckoff case in 1944 has been consistently adhered to ever since. *Mogul Transportation Co. v. Larison,* 181 Or 252, 264, 181 P2d 139; *State v. Garver,* 190 Or 291, 305, 225 P2d 771; *Gow v. Multnomah Hotel, Inc.,* 191 Or 45, 53, 224 P2d 552, 228 P2d 791; *Fowler v. Courtemanche,* 202 Or 413, 454, 274 P2d 258.

This map of 1852, standing alone, warrants a conclusion that what is now a bar adjoining the uplands was, in fact, an island in 1851 and continued as an island up to October 18, 1878 (the approval date of the statute repealing the Act of 1874), unless there is other evidence to overcome the evidentiary impact of this exhibit of the state.

The presumption of continuing "island" character of what is now conceded to be a bar appears to be interrupted by the force of another map offered by the upland owners. This later map is the result of a survey made by the Corps of Engineers of the United States of America, bearing date of September, 1895, and seems to show that the island area had become a bar adjoining the upland as of that date. There is, however, some evidence that Meldrum Bar was separated from the upland by a small stream of water through the east channel at low water as late as 1900.

Thus, so far as maps are concerned, we have two of equal authenticity disclosing Meldrum Bar to have been an island in 1851 and a river bar in 1895. But we find no maps or other exact evidence of that kind which tells us whether it was an island or bar in the vital period of 1874 to 1878. Standing alone, the map of 1895, does no more than to rebut the presumption raised by the map of 1852 that the island character of Meldrum Bar continued longer than 1895.

The map of 1895 still leaves the most important question unanswered: did the island cease to be an island before 1878 or was it after that year and prior to 1895 that it assumed its present character as a bar adjoining the upland?

A careful examination of the record fails to disclose any positive evidence adduced by the upland owners which overcomes or rebuts the presumption that Meldrum Bar continued as an island up to October 18, 1878, or, for that matter, even as late as 1895.

The state attempted to supplement the force of the statutory presumption and the upland owners to overcome its impact by resort to other evidence. The state and the upland owners, to accomplish their respective objectives, relied on the testimony of elderly persons who had some memories of the conditions of the channel at earlier periods. The state also sought to accomplish its purpose through evidence supplied by experts, particularly by the testimony of Dr. Mackin. Both parties introduced maps (in addition to those of 1852 and 1895), charts, hydrographs, aerial photographs and core borings of trees growing on Meldrum Bar, but none of this species of evidence reached back as far as 1878, although most all touched upon some phase of the history of the waters of the Willamette River in the area of the bar.

Speaking generally, we find, as did the circuit court, that we can give but little credence to the conflicting testimony based upon recollections of these elderly witnesses, whether called by upland owners or called by the state. The two who testified in behalf of the upland owners were both in their eighties at the time of trial and both only four years old in 1878. One when seven years old and the other when a boy of eleven fished along the shores of the Willamette River in the area of the land in controversy. There were also two river boat captains and a game warden, all men of advanced years, and all testifying in behalf of the state from memory of conditions, as they claimed, that were in existence from approximately 1900 to 1931. Not one was able to contribute anything concerning the condition of the channel between the island and the upland during the years 1874 to and including 1878.

The testimony of the experts does not supply us with any positive testimony supporting the presumption arising from the map of 1852 and particularly during the period from 1874 to 1878; nor can we find in the evidence of the upland owners any facts giving rise to inferences which can be said to overcome the force of the presumption derived from the 1852 map.

In this matter, the presumption invoked from ORS 41.360(32), supra, stands not alone. The state's claim to title is fortified by another presumption of cardinal importance. *State v. McVey,* 168 Or 337, 121 P2d 461, 123 P2d 181, was a suit in which the state claimed title to a certain portion of the bed of the Willamette River. There, we held, at p 345, that the ownership of all river beds below high water mark of all navigable streams which the state obtained on admission to the union is presumed to continue until the state is shown

to have parted with its title. No showing has been made by the upland owners here that the state made any grant of the land in question subsequent to 1878, nor that the uplands qualified under the grant by the Laws of 1874 so as to entitle them to successfully assert now that the state was by that act divested of title to Meldrum Bar.

The upland owners argue that the evidence at the trial conclusively demonstrates that the low depression marking the erstwhile location of the easterly channel which once separated Meldrum Bar from the upland shows that it was within the boundaries of the Rinearson Donation Land Claim as patented. Based upon this contention, they claim that it falls within the rule of *State v. Imlah,* supra, where the court held against the state because it found from the evidence in that case that "the channel itself was on defendants' premises and above the meander line of the river" (135 Or at p 69). Our examination of the evidence in the instant matter, and particularly that portion thereof stressed by the appellants, does not warrant the conclusions which they derive therefrom. To the contrary, we find that the old channel as described in the evidence is outside the metes and bounds description of the upland and the meander line, which, in the absence of other evidence, was the river boundary. For that reason the Imlah case has no value here.

With positive proof that Meldrum Bar was an island in 1852 and in the absence of any substantial proof warranting a conclusion as to the date when the island became attached to the upland bank on the east of the river at low water, we have no recourse but to be governed by the presumption (ORS 41.360(32), supra) and hold that the title reposes in the state of

Oregon, free from any claims of the upland owners, or their successors in interest.

■ The third proposition goes to the propriety and power of the court to vacate its decree for the purpose of admitting what they allege to be newly discovered evidence. The evidence which they thus sought to get into the record consisted of some maps found long after the trial.

Trial was had on the third and fourth of February, 1955, but the decree was not entered until March 21, 1955, nearly seven weeks thereafter. The motion to vacate the decree for the purpose indicated was not presented until May 16, 1955.

The statute authorizing the granting of new trials applies only to law actions and not suits in equity. *Mannix v. Harju,* 125 Or 258, 260, 266 P 238; *Waldow v. Waldow,* 189 Or 600, 604, 221 P2d 576.

The term of the court expired on the first Tuesday in April. ORS 4.150. After that time the court had no jurisdiction to vacate its decree unless it appeared from the record that it was without jurisdiction to render judgment. Its authority after term time was limited to the correction of clerical or formal errors. *Harris v. Harris,* 192 Or 361, 366, 232 P2d 818.

Newly discovered evidence is a ground for new trial in actions at law (ORS 17.610(4)), but has no application to suits in equity. *Waldow v. Waldow,* supra, at p. 605.

The appellants correctly anticipate our holding in the admission in their brief of knowledge that this court has over a period of years held adversely to their contention.

We find no merit in appellants' propositions three or four.

Affirmed. Costs to neither party.